The BABCOCK & WILCOX COMPANY, Appellant,

v.

PMAC, LTD., Appellee.

No. A14–93–00148–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 23, 1993.

---

James E. Doyle, Ronald J. Restrepo, Houston, for appellant.

Leonard H. Simon, Timothy Henderson, Todd J. Zucker, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and ELLIS and LEE, JJ.

## OPINION

ELLIS, Justice.

This is an appeal from a final judgment confirming a $1,000,000 arbitration award in favor of PMAC, LTD. (PMAC)[1]. The Babcock & Wilcox Company (B & W), appeals from that award and raises four points of error contending that the arbitration process was flawed. We affirm.

In the summer of 1987, Grady Nance, acting on behalf of B & W, contacted Robert Alpert, the President of PMAC's corporate general partner, and invited him to bid on the purchase of seven steel plants located in Pennsylvania and Texas. During the bid process, Alpert inspected the plants, including the East Works Plant located in Beaver Falls, Pa., and had extensive discussions with B & W's former manager of tubing operations. In December 1987, PMAC was one of three bid finalists. However, B & W awarded the purchase contract to a non-finalist, Lone Star Technologies, Inc. (Lone Star). On July 7, 1988, a fire destroyed the building and certain equipment at B & W's East Works Machine Shop. Thereafter, B & W, who had a "replacement policy" on the machine shop building and equipment, filed a claim with its insurance carrier. The carrier hired a company that specialized in adjusting industrial insurance claims to prepare a damage analysis. The adjusting company in turn hired Fred Donaldson, who inspected the machine shop and filed a report. B & W received a settlement in the amount of $2,783,301 from the insurance carrier. Although B & W had promised to give Lone Star a $100,000 credit for the building and equipment destroyed by the fire, the transaction between B & W and Lone Star subsequently fell through. In the summer of 1989, B & W contacted Alpert to determine whether he was still interested in purchasing the plants.

On November 17, 1989, after a one-day negotiation, the parties executed a Letter Agreement for PMAC's purchase of the B & W plants and Alpert placed $5,000,000 cash in escrow. On the same day, Nance and B &

W's counsel, Jack Arnold, informed Alpert and his counsel, William Boyar, that the building and certain equipment at B & W's East Works Machine Shop had been destroyed by fire and that B & W had filed an insurance claim. On January 15, 1990, PMAC executed the Purchase and Sale Agreement (the purchase agreement). The purchase agreement called for a reduction in the purchase price by the fair market value of the assets destroyed by the fire at the East Works Machine Shop (the destroyed assets). The purchase agreement also called for a valuation of those assets by an independent, third-party appraiser agreed upon by the parties. In early March 1990, the parties agreed to use MB Valuation Services (MB) as the independent appraiser.

On March 29, 1990, after exchanging numerous drafts, the parties agreed to a Memorandum (the instruction memorandum) which provided MB with joint instructions, as required by the purchase agreement, on the methodology for determining the fair market value of the destroyed assets. The instruction memorandum called for the determination of the fair market value of the destroyed assets on an "as is, where is basis, assuming that the fire had not occurred." It also declared that "fair market value shall be expressed in terms of money that may reasonably be expected to exchange between a willing buyer and a willing seller with equity to both, neither under any compulsion to buy or sell, and both fully aware of all relevant facts as of a certain date." It further stated that the appraiser could consider certain factors in determining fair market value including: (1) use of the assets; (2) location of the assets; (3) supply and demand; (4) replacement cost for the assets; (5) age of the assets; and (6) any other "appropriate" factors. The instruction memorandum was not actually executed until two months later.

Attached to the instruction memorandum was a schedule of destroyed assets that corresponded to the list contained in the purchase agreement. Although B & W had previously supplied an additional description of the destroyed assets, the MB appraiser,

---

1. The record refers to several corporate predecessors-in-interest to PMAC who were involved in the transactions at issue. For purposes of simplicity, we will refer to those entities as PMAC.

Allen Bealmear, withdrew on July 27, 1990, because he did not have "sufficient information to perform an appraisal based on fair market value." Before Bealmear's withdrawal, B & W had rejected requests by both PMAC and Bealmear to obtain the insurance claim file. The parties were subsequently unable to agree on fair market value by the October 4, 1990, closing date. On that date, the parties executed a Second Amendment (the second amendment) to the purchase agreement that required B & W to produce the insurance claim file and provided, in the event of a dispute regarding the fair market value of the destroyed assets, for arbitration. The amendment also limited B & W's maximum liability to PMAC for the assets to $1,200,000. Although B & W produced the insurance file for PMAC five days later, the parties were unable to agree on the fair market value of the destroyed assets.

On January 15, 1991, PMAC filed its demand for arbitration with the American Arbitration Association. B & W answered on February 18, 1991. Thereafter, the parties engaged in extensive discovery. On October 1, 1991, each party filed a Pre–Arbitration Statement. On November 8, 1991, PMAC filed a lawsuit in state court alleging that B & W fraudulently induced PMAC to enter into the entire transaction. The suit also sought declaratory relief as well as actual and punitive damages, attorney's fees, interest, and costs. On December 16, 1991, B & W moved to stay the litigation and to compel arbitration. On January 29, 1992, the trial court ordered the parties to arbitration and stayed the instant lawsuit pending the completion of that proceeding.

The arbitration proceeding began on April 21, 1992, and concluded on April 24, 1992. On the first day of the arbitration proceeding, PMAC served B & W's trial counsel with an Amended Demand for Arbitration. That motion is not included in the record. According to PMAC, the motion requested a determination of the value of the destroyed assets above the liability cap set in the amendment, plus attorney's fees and exemplary damages. Two months later, on June 27, 1992, the arbitrator awarded PMAC $1,000,000 and required B & W to pay that

amount within thirty days. On June 30, 1992, B & W moved to vacate or modify the award in the trial court. On August 12, 1992, PMAC filed a response and moved to confirm the award. On August 24, 1992, after a hearing, the trial court denied B & W's motion and confirmed the award. On October 19, 1991, after a hearing, the trial court entered judgment confirming the arbitration award and awarding PMAC $1,000,000, plus pre- and post-judgment interest. The court denied PMAC's request for attorney's fees. B & W's motion for new trial was overruled and B & W perfected this appeal.

In its first point of error, B & W contends the trial court erred in failing to find that the arbitrator exceeded his authority. B & W asserts that the second amendment to the purchase agreement contained a narrowly drawn arbitration clause which restricted the arbitrator's jurisdiction solely to determining the fair market value of the destroyed assets. B & W maintains that the arbitrator exceeded his authority by admitting evidence other than of fair market value.

 The parties do not dispute that the transaction at issue involves interstate commerce and is governed by the Federal Arbitration Act (the Act). 9 U.S.C. § 1, *et seq.* (1970). Judicial review of a commercial arbitration award is extraordinarily narrow, and is limited only to sections 10 and 11 of the Act. *Forsythe Int'l, S.A. v. Gibbs Oil Co. of Tx.*, 915 F.2d 1017, 1020 (5th Cir.1990). The issue upon review of an arbitrator's award is whether the arbitration proceedings were fundamentally unfair. *Id.* Although review is de novo, we must give strong deference to the arbitrator and are not free to correct the arbitration award. *See McIlroy v. Painewebber, Inc.*, 989 F.2d 817, 819–29 (5th Cir. 1993) (citing *Forsythe Int'l*, 915 F.2d at 1020–21)).

 Section 10(a)(4) of the Act provides that an award may be vacated "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made." Whether a contract's arbitration clause requires arbitration of a given dispute is a matter of contract interpretation and a question of law for the

court. *AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 649, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986); *Beckham v. William Bayley Co.*, 655 F.Supp. 288, 290 (N.D.Tex.1987). A party cannot be compelled to submit a dispute to arbitration unless there has been a contractual agreement to do so. *Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir. 1990). The law imposes a presumption in favor of arbitrability which requires, whenever the scope of an arbitration clause is fairly debatable or reasonably in doubt, that the court decide the question of interpretation in favor of arbitration. *Beckham*, 655 F.Supp. at 290. The weight of this presumption is heavy. *Mar–Len of La., Inc. v. Parsons–Gilbane*, 773 F.2d 633, 636 (5th Cir.1985).

■■■ However, the strong federal policy that favors resolving doubts in favor of arbitration cannot serve to stretch a contractual clause beyond the scope intended by the parties or authorize an arbiter to disregard or modify the plain and unambiguous provisions of the agreement. *See Teamsters v. Stanley Structures, Inc.*, 735 F.2d 903, 905 (5th Cir.1984); *Beckham*, 655 F.Supp. at 291–92. Thus, where an arbitration clause is narrowly drawn, judicial review of the arbitrator's jurisdiction, as opposed to the merits of an arbitration award, is less deferential. *See Container Products, Inc. v. United Steelworkers of Am., and Its Local 5651*, 873 F.2d 818, 819–20 (5th Cir.1989).

■■ On the other hand, arbitration should not be denied unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue. *Neal*, 918 F.2d at 37; *Beckham*, 655 F.Supp. at 290. The presumption of arbitrability is particularly applicable where the clause is broad; that is, it provides for arbitration of "any dispute arising between the parties," or "any controversy or claim arising out of or relating to the contract thereof," or "any controversy concerning the interpretation, performance or application of the contract." *AT & T Technologies*, 475 U.S. at 650, 106 S.Ct. at 1419; *Hornbeck Offshore (1984) Corp. v. Coastal Carriers Corp.*, 981 F.2d 752, 754 (5th Cir.1993); *Mar–Len of La.*, 773 F.2d at

636; *Beckham*, 655 F.Supp. at 291. In such instances, absent any express provision excluding a particular grievance from arbitration, only the most forceful evidence of purpose to exclude the claim from arbitration can prevail. *AT & T Technologies*, 475 U.S. at 650, 106 S.Ct. at 1419 (quoting *United Steelworkers of America v. Warrior & Gulf Navigational Co.*, 363 U.S. 574, 584–85, 80 S.Ct. 1347, 1353–54, 4 L.Ed.2d 1409 (1960)); *Mar–Len of La.*, 773 F.2d at 636.

The arbitration provision at issue is contained in section 5(c) of the second amendment. That section provides:

If Seller and Buyer are unable to agree to the Fair Market Value of the Destroyed Assets within the thirty (30)–day period provided for in paragraph 5(c)(iii) hereof, then Seller and Buyer agree to submit their dispute ("Dispute") regarding Fair Market Value of the Destroyed Assets to final and binding arbitration before a single, independent third-party arbitrator in accordance with the following procedures:

(A) Buyer and Seller (individually a "Party" or collectively the "Parties") shall arbitrate the Dispute in accordance with the Commercial Arbitration Rules of the American Arbitration Association, as supplemented hereby.

(B) The Parties themselves to arbitrate any Dispute in Houston, Texas.

(C) *The Parties further agree that* (i) the arbitrator may render an interim ruling regarding discovery, summary proceedings, or other pre-arbitration matters, and (ii) *all claims of any type by any of the Parties, including any and all defenses, are included in the jurisdiction of the arbitration.*

(D) The Parties shall, within ten (10) days after the expiration of the thirty (30)–day period described in paragraph 5(c)(iii) hereof, select a single, independent, third-party individual who is knowledgeable in the valuation of industrial facilities, including real estate, machinery and equipment, with at least ten (10) years of experience in such valuation activities, which individual shall not be connected in any way with MB. If the Parties are unable to agree on

the arbitrator, then such arbitrator shall, at the request of any of the Parties, be appointed by the American Arbitration Association based on the foregoing criteria.

(E) The Parties hereby submit to the in personam jurisdiction of the United States District Court for the Southern District of Texas, Houston Division, and agree that such Court may enter all such orders as may be necessary or appropriate to enforce the provisions hereof and/or confirm any pre-arbitration ruling or decision or any award rendered by the arbitrator. The award rendered by the arbitrator shall be final, and judgment may be entered upon it in accordance with applicable law in the United States District Court for the Southern District of Texas, Houston Division, or in any court having jurisdiction thereof.

(F) Any costs or other expenses (excluding attorney's fees and costs incurred) arising out of or occurring because of the arbitration proceedings shall be borne equally by the Parties.

(emphasis added).

 Applying ordinary contract principles, the scope of the above arbitration provision plainly and unambiguously embraced "all claims of the parties ... including any and all defenses" in determining the fair market value of the destroyed assets. *See Valero Refining Inc. v. M/T Lauberhorn,* 813 F.2d 60, 64 (5th Cir.1987).[2] Therefore, even

if the arbitrator heard evidence other than of fair market value, it was proper for him to do so.[3] Here, the arbitration proceeding focused on resolving the following issues: (1) the methodology for determining fair market value; (2) the particular assets to be included in the valuation process; and (3) the actual fair market value of those assets. These issues were hotly contested and clearly within the scope of the parties agreement to arbitrate "all claims and defenses" regarding fair market value as embraced in the second amendment to the purchase agreement.

 B & W also contends that the arbitrator exceeded his authority by ignoring the objections of B & W's trial counsel and by excluding evidence of fair market value offered by B & W. This contention is simply not supported by the record. To bolster its argument, B & W quotes out of context the opening remark by the arbitrator as well as numerous objections lodged by its trial counsel during the course of the proceeding. Consistent with the agreement to arbitrate "all claims and defenses" of the parties, the arbitrator made it clear at the outset of the arbitration that he would not entertain numerous objections but that he intended to hear all the evidence offered by the parties and would later determine what evidence was relevant:

> This will be a fairly informal meeting. It won't be like in a court trial. And I'm not

---

2. Because of our broad reading of the arbitration provision, we need not address PMAC's argument that B & W was estopped from asserting a narrow interpretation of the arbitration provision as a result of taking a contrary position in its pre-arbitration pleadings.

3. PMAC alleged in its lawsuit that B & W fraudulently induced PMAC to enter into the entire transaction by concealing certain information that was material to the determination of fair market value. Because B & W's alleged failure to disclose information was so intertwined with the determination of fair market value, the arbitrator, though not a lawyer or judge, heard evidence on that issue. We note that fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—is not subject to arbitration. *R.M. Perez & Associates Inc. v. Welch,* 960 F.2d 534, 538 (5th Cir.1992) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–4, 87 S.Ct. 1801, 1805–6, 18 L.Ed.2d 1270

(1967)); *Bhatia v. Johnston,* 818 F.2d 418, 421 (5th Cir.1987). However, fraud that relates to the entire agreement must be decided by the arbitrator. *R.M. Perez & Associates, Inc.,* 960 F.2d at 538; *Bhatia,* 818 F.2d at 421. Although the award states that it "is in full settlement of all claims submitted to this arbitration," the arbitrator was not required to, and did not specifically find fraudulent inducement by one party or the other. However, even if the arbitrator had made such a finding, it would have been proper for him to do so not only because the fraudulent inducement claim went to the entire transaction but also because neither PMAC nor B & W specifically complained during the arbitration proceeding itself or in pre- and post-arbitration proceedings before the trial court that the arbitrator was without authority to consider, or improperly considered, that claim. Therefore, that issue was waived and is not properly before us. *See* Tex.R.App.P. 52(a).

going to allow a tremendous amount of objections because I will decipher whether its right or wrong. I want to render an honest and good opinion of this situation and do the best job I can for you people, so I think we can all get along real fine and get this all taken care of.

The arbitrator strictly adhered to the above principle to the extent that he allowed the parties considerable latitude in presenting their proof. He strayed only to allow the parties the opportunity to fully state their respective positions and air their objections. In fact, given the animosity between the parties that is apparent from the record, the arbitrator may have given the parties too much latitude to interject their views during the proceeding. Contrary to what B & W suggests, the mere fact that B & W's trial counsel mentioned in his objections that he felt the proceedings were beyond the scope of the parties' agreement does not mean that it was so. B & W's trial counsel never once explained to the arbitrator why he thought the proceedings were going beyond the scope of the agreement. Instead, his objections were directed primarily to the leading nature of the questions asked by PMAC's trial counsel and to the narrative responses by PMAC's witnesses. Furthermore, the arbitrator did not, as B & W asserts, preclude B & W from putting on evidence of fair market value through the testimony of its expert. Only when B & W's expert attempted to attack the credentials of the insurance carrier's appraiser, Mr. Donaldson, did the arbitrator interrupt the proceedings to halt that line of questioning by B & W's trial counsel. B & W's trial counsel agreed with the arbitrator's assessment and moved on with her questioning. Given the broad nature of the arbitration clause, we cannot say that the arbitrator exceeded his authority. We overrule B & W's first point of error.

In its second point of error, B & W contends the trial court erred by failing to find that the award was procured by "undue means" or that the arbitrator acted with "evident partiality." 9 U.S.C. § 10(a)(1), (2). ▪ B & W did not object to the selection of the arbitrator or to any alleged bias on the part of the arbitrator at the time of the hearing and thus, waived the right to complain. *See Bernstein Seawell & Kove v. Bosarge,* 813 F.2d 726, 732 (5th Cir.1987). As the Ninth Circuit has noted, "a party may not sit idle through an arbitration procedure and then collaterally attack that procedure on grounds not raised before the arbitrator when the result turns out to be adverse." *Marino v. Writers Guild of Am., East, Inc.,* 992 F.2d 1480, 1484 (9th Cir.1993). "This rule extends even to questions such as arbitrator bias, that go to the very heart of arbital fairness." *Id.*

However, even if B & W had timely objected, its argument is without merit. B & W contends that MB and Bealmear breached a fiduciary duty to B & W when: (1) MB failed to disclose its prior relationship with PMAC; (2) Bealmear failed to complete the appraisal of the assets in question; and, (3) Bealmear testified as an expert for PMAC after he had been hired by the parties as an independent appraiser. B & W notes that Bealmear certified MB's impartiality and its commitment to conduct a fair market value appraisal. B & W concludes that because the arbitrator was required by the second amendment to the purchase agreement to determine the fair market value of the destroyed assets and nothing else, the arbitrator's failure to condemn the behavior of MB and Bealmear and to disregard Bealmear's testimony on replacement value was tantamount to a knowing participation in that breach of fiduciary duty and a violation of section 10(a).

As we described, the purchase agreement specifically required the parties to jointly hire an "independent third party appraiser" to value the destroyed assets. Bealmear withdrew as the appraiser without completing a valuation of the assets. Shortly thereafter, Bealmear performed an appraisal for PMAC. PMAC later hired Bealmear as an expert to testify at this arbitration. Although it now maintains that the arbitrator could not consider anything except "fair market value," B & W questioned MB's independence throughout the arbitration. Indeed, the record reflects that PMAC did have questionable contacts with MB both prior to the parties' agreement to hire MB as well as after Bealmear's resignation. The nature,

extent, and disclosure of those contacts was another hotly contested issue.

■ However, even if there was a breach of some sort of fiduciary duty or some other improper conduct on the part of MB and Bealmear, there is no evidence in the record that the arbitrator was a party to that conduct. A party seeking to vacate an award on the basis of evident partiality must prove the existence of facts which would establish a reasonable impression of the arbitrator's partiality to one party. *Bosarge*, 813 F.2d at 732 (citing *Sheet Metal Workers Int'l Ass'n v. Kinney Air Conditioning Co.*, 756 F.2d 742, 745 (9th Cir.1985)). In the absence of evidence showing partiality, we refuse to find that the arbitrator was a party to any improper conduct by any party merely because he presided over the arbitration.

■ The parties agreed at the arbitration that the credit for the destroyed assets was to be determined on the basis of fair market value. However, the parties disagreed as to the precise methodology for calculating fair market value as set out in the instruction memorandum. PMAC's position was that "fair market value" meant that PMAC would be "made whole" for the destruction caused by the fire. According to PMAC, the instruction memorandum called for an appraisal based on fair market value (i.e., "a willing buyer and a willing seller") but incorporated concepts of replacement or insurance value (i.e., "as is, where is basis, assuming the fire had not occurred" and "replacement cost") in the methodology. PMAC asserted that it could not obtain a fair market appraisal in accordance with the instruction memorandum because B & W withheld its insurance claim file. According to PMAC, that claim file contained a precise assessment of replacement cost and a list compiled by the insurance appraiser, Donaldson, that more accurately described equipment that was destroyed in the fire as well certain other equipment that was omitted from, and/or inaccurately described in, the purchase agreement.

B & W's position was that the insurance claim file was irrelevant because the claim was brought under a "replacement policy," and "fair market value" did not mean "re-placement value." B & W asserted that "fair market value" meant simply that PMAC would receive a credit in the transaction involving "a willing buyer and a willing seller." B & W also asserted that the credit would be only for the destroyed assets listed in the purchase agreement and attached to the instruction memorandum. Finally, B & W maintained that the purchase agreement and instruction memorandum called for a "straight" fair market appraisal of the destroyed assets by a neutral appraiser without reference to the insurance claim file in the methodology. According to B & W, MB was not an impartial appraiser and never actually performed a fair market appraisal of the assets in question.

Consistent with the second amendment, the arbitrator was an experienced, qualified appraiser. He was obligated not only to determine fair market value but also to hear "all claims and defenses" related thereto, including the meaning of the instruction memorandum. The arbitrator did not make a finding with respect to the meaning of the instruction memorandum. In any event, an arbitrator does not exceed his authority merely because he might have misinterpreted the parties' agreement. *See Federated Dept. Stores v. J.V.B. Industries, Inc.*, 894 F.2d 862, 866 (6th Cir.1990). Here, B & W in essence complains that the arbitrator should only have heard evidence that supported its narrow interpretation of the instruction memorandum, and that the arbitrator was biased for allowing PMAC to present evidence that supported its broader interpretation of that document. This argument not only conflicts with the second amendment, but is plainly contrary to the very meaning of fairness and we reject it.

■ B & W also asserts that the arbitrator made inappropriate business overtures to B & W during the proceeding. An affidavit by Jack Arnold alleged that during course of the arbitration proceedings, the arbitrator gave him his business card and offered his services for any future appraisals. According to Arnold, the arbitrator invited him to stop by his office the following week when Arnold would be in town. Arnold stated that

he refused the arbitrator's offer and told the arbitrator that his conduct was improper. "Evident partiality" within the meaning of section 10(a)(2) means more than mere appearance of bias. *Bosarge*, 813 F.2d at 732 (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171 (2nd Cir.1984)). As Arnold conceded, the arbitrator made the same apparently conspicuous overtures to PMAC's trial counsel. However, according to Arnold, PMAC's trial counsel responded that he would consider the arbitrator for any future work. Even if that were true, it does not necessarily follow that the arbitrator's impartiality was compromised. We find that B & W has not proven evident partiality on the part of the arbitrator under section 10(a). We overrule B & W's second point of error.

In its third point of error, B & W contends the trial court erred by refusing to vacate the arbitrator's award on the ground that the arbitrator excluded material evidence. 9 U.S.C. § 10(a)(3).

█ B & W contends, without citing to the record, that the arbitrator allowed PMAC to present evidence other than of fair market value and excluded evidence from B & W's expert, David Lang, regarding fair market value. B & W also contends that it was prohibited from cross-examining PMAC's expert. The burden is on the litigant to show that the record supports its contentions and to point out the place in the record where the matters complained of, or upon which the litigant relies, are shown. *Elder v. Bro*, 809 S.W.2d 799, 801 (Tex. App.—Houston [14th Dist.] 1991, writ denied) (citing *Most Worshipful Prince Hall v. Jackson*, 732 S.W.2d 407, 412 (Tex.App.—Dallas 1987, writ ref'd n.r.e.)); *see* TEX. R.APP.P. 74. Because B & W does not identify in the record the particular evidence offered by PMAC that should have been excluded or detail where in the record B & W was denied cross-examination or precluded from offering evidence, we cannot say that the arbitrator failed to consider all the relevant evidence.

█ Furthermore, an arbitrator is not bound to hear all of the evidence tendered by the parties as long as he gives each of the parties an adequate opportunity to present their evidence and arguments. *Forsythe*, 915 F.2d at 1023. "An evidentiary error must be one that is not simply an error of law but which so affects the rights of a party that it may be said that he was deprived of a fair hearing." *Id.* (quoting *Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.*, 397 F.2d 594, 599 (3d Cir.), *cert denied*, 393 U.S. 954, 89 S.Ct. 378, 21 L.Ed.2d 365 (1968)). If the arbitrator's decision rests on an adequate basis, then complaints that he failed to address all issues presented will not render the proceedings "fundamentally unfair" or justify disturbing the award. *Forsythe*, 915 F.2d at 1023. The arbitrator generously allowed each side to present evidence of what it considered to be fair market value. Just because B & W disagrees with PMAC's evidence of fair market value does not mean that B & W was deprived of a fair hearing. We overrule B & W's third point of error.

█ In its fourth point of error, B & W contends the trial court erred by failing to find that there was no rational basis for the award. B & W asserts that the arbitrator made an "evident material miscalculation of figures" by awarding "damages" in the amount of $1,000,000. 9 U.S.C. § 11(a). B & W claims that the arbitrator, by characterizing the award as "damages," did not base the award on fair market value. B & W also asserts that its experts were the only individuals to perform a fair market value appraisal.

The Fifth Circuit has adopted the following definition of "evident material miscalculation" under section 11:

Where the record before the arbitrator demonstrates an unambiguous and undisputed mistake of fact and the record demonstrates strong reliance on that mistake by the arbitrator in making his award, it can fairly be said that the arbitrator exceeded his powers. (citation omitted) We interpret the term "undisputed" to mean that "we should look to see whether there is any rational basis for disputing the truth of the fact."

*McIlroy*, 989 F.2d at 820.

B & W's experts established that the fair market value of the destroyed assets was $210,818.16. David Lang appraised only the

destroyed machinery and equipment and, based on a comparison of similar machinery and equipment in the market, determined their fair market value was $42,000. George Swallow appraised the destroyed building and determined its fair market value was $168,818.16. PMAC's expert, Allen Bealmear, determined that the value of the destroyed assets was $1,736,582.40.[4] Relying on his interpretation of the instruction memorandum, Bealmear used "replacement cost new" less depreciation in the form of physical deterioration. B & W's own expert, Lang, conceded that while comparables was the preferable method of determining fair market value, replacement cost less depreciation could be used in determining fair market value. Lang merely criticized Bealmear for not considering functional and economic obsolescence in figuring the depreciation of the equipment and machinery.

■■■■ An arbitrator need not explain the rationale behind his or her award. *See id.; Valentine Sugars Inc. v. Donau, Corp.,* 981 F.2d 210, 214 (5th Cir.1993). If the award is rationally inferable from the facts before the arbitrator, we must affirm the award. *Valentine Sugars,* 981 F.2d at 214. As we stated, the arbitrator was an experienced, qualified appraiser and it was left for him to judge the credibility of witnesses and the weight to be given the evidence in determining fair market value as set out in the instruction memorandum. The arbitrator's award of $1,000,000 fell almost halfway between the $200,000 value established by B & W's experts and the 1,700,000 value established by PMAC's expert. It was also within the $1,200,000 limit of liability fixed by the parties in the second amendment to the purchase agreement. When parties agree to arbitration, they agree to accept whatever reasonable uncertainties might arise from the process. *McIlroy,* 989 F.2d at 821 (quoting *Raiford v. Merrill, Lynch, Pierce, Fenner, and Smith, Inc.,* 903 F.2d 1410, 1413 (11th Cir.1990)). The size of the award is one such uncertainty and a claimant's dissatisfaction alone will not support judicial modification of that award. *McIlroy,* 989 F.2d at 821. Because this very dispute was about determining the fair market value of the destroyed assets, it cannot be said that the arbitrator relied on an "undisputed mistake of fact" in determining his award. We find that the arbitrator's award was rationally inferable from the facts before him. We overrule B & W's fourth point of error.

■■■■ By two cross-points, PMAC contends that it is entitled to attorney's fees. In its motion to confirm the award, PMAC requested attorney's fees pursuant to Tex.Civ. Prac. & Rem.Code Ann. § 38.001. (Vernon 1986). PMAC asserts, without citing any authority, that the trial court erred by not awarding attorney's fees in connection with B & W's "groundless" challenge of the award.[5]

■■■■ Although it is not entirely apparent from the proceeding itself, the issue of attorney's fees was decided by the arbitrator. The second amendment authorized the arbitrator to resolve "all claims of any type by any of the parties." It also specifically excluded attorney's fees from those "costs or expenses to be borne equally by the parties." PMAC also allegedly sought attorney's fees in its amended demand for arbitration. Because the parties agreed to submit the issue

---

4. PMAC also offered a pre-trial statement from a subrogation action brought by B & W's insurance carrier to recover damages against the alleged culprit of the fire. That pleading claimed damages in excess of $2,000,000. In support of that figure, two appraisals were attached to the pre-trial statement. One appraisal by the Chiappetta Agency determined that the destruction of the building decreased the "market value" of the East Works plant by $1,094,000. The other appraisal by Fred Donaldson determined that the "replacement value" of the destroyed equipment was $1,432,800 and that the "actual cash value" of that equipment was $529,020. Of course, B & W asserts that these appraisals have nothing to do with "fair market value" because B & W's insurance carrier filed the lawsuit solely to recover funds paid out under the replacement policy.

5. PMAC asks us to award attorney's fees incurred at trial and on appeal. An award of any attorney's fees is a fact issue and we are not free to initiate such an award because that would be an exercise of original rather than appellate jurisdiction. *See Security Life Ins. Co. v. Spray,* 468 S.W.2d 347, 349 (Tex.1971). Thus, any finding that PMAC is entitled to attorney's fees would require a remand for determination of the amount.

of attorney's fees to arbitration, the trial court was precluded from interfering with the arbitrator's jurisdiction and impermissibly modifying his decision. *See Schlobohm v. Pepperidge Farm, Inc.,* 806 F.2d 578, 581 (5th Cir.1986). To allow judicial intervention to award additional relief would be inconsistent with the language and policy of the Federal Arbitration Act which encourages parties to avoid litigation by agreeing to resolve their disputes through arbitration. *See id.*

Even if the parties failed to submit the issue of attorney's fees to the arbitrator, we cannot say that the trial court improperly refused to award attorney's fees pursuant to section 38.001. Ordinarily, an award of reasonable attorney's fees founded upon a contract claim is mandatory under section 38.001 following proper presentment of the claim. *See Smith v. United Nat'l Bank–Denton,* 966 F.2d 973, 977 (5th Cir.1992). An essential element to the recovery of attorney's fees under section 38.001 is the existence of a duty or obligation which the opposing party has failed to meet. *Schlobohm,* 806 F.2d at 582 (quoting *Ellis v. Waldrop,* 656 S.W.2d 902 (Tex.1983)). The instant case does not involve a "contract claim" *per se,* rather, it is in the nature of a proceeding to enforce a provision in a contract. Here, as in *Schlobohm,* B & W was not found to have breached the contract or any other obligation. The parties merely agreed to arbitrate the issue of the fair market value of the destroyed assets and any and all claims or defenses related thereto upon their failure to negotiate a good faith settlement. The allegations and accusations raised by each party regarding the other side's conduct during the appraisal process and negotiations were all within the arbitrator's jurisdiction and considered by him. Where the parties anticipate a dispute and provide a contractual method for its resolution, invocation of that method is not a breach of contract. *Id.*

Also, B & W's failure to pay the award within thirty days after it was rendered as required by the award did not, as PMAC suggests, constitute a breach because B & W moved to vacate and/or modify the award on June 30, 1992, three days after it

was rendered. Under the Act, B & W had three months to bring a motion to vacate. 9 U.S.C. § 12. While the parties agreed in the second amendment that "the award rendered by the arbitrator shall be final and judgment may be entered upon it in accordance with applicable law. . . . in any court having jurisdiction thereof," neither party was precluded by that provision from challenging the award under sections 10 and 11. In addition, although the arguments raised by B & W were far from compelling, we cannot say they were groundless. Hence, we find, based on the record before us, that the trial court properly refused to award attorney's fees. Accordingly, we overrule B & W's points of error and PMAC's cross-points and affirm the trial court's judgment.