**Affirmed, in Part, and Reversed and Remanded, in Part, and Opinion filed November 6, 2012.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-12-00272-CV

---

## COTTON COMMERCIAL USA, INC., Appellant

## V.

## CLEAR CREEK INDEPENDENT SCHOOL DISTRICT, Appellee

---

**On Appeal from the 405th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 10-CV-4248**

---

## OPINION

Appellant, Cotton Commercial USA, Inc. (hereinafter "SURVIVING COMPANY"), appeals the trial court's order denying its motion to compel arbitration of

appellee's, Clear Creek Independent School District (hereinafter "the School District"), claims. We affirm, in part, and reverse and remand, in part.

## I. Background

On September 8, 2012, the School District executed a "Restoration Service Agreement" with Cotton Commercial USA, L.P. d/b/a Cotton USA (hereinafter "CONTRACTOR") for debris removal and remediation and restoration services to the School District's school campuses after Hurricane Ike (the Restoration Agreement).[1] It is undisputed that the Restoration Agreement contained the following arbitration provision:

> ***Any controversy, dispute or claim arising out of this Agreement or the Work done hereunder*** (which can not [sic] be amicably resolved by senior management representatives of Cotton and the Customer), shall first be submitted to non-binding mediation. Both parties shall share equally in the expense of such mediation in which a non-interested mediator shall serve to facilitate the resolution of the dispute. *If such controversy, dispute or claim can not [sic] be settled or resolved by non-binding mediation, either party may then submit such dispute to arbitration* in accordance with the terms of this Article VII, provided, however, that in circumstances where equitable (non-monetary) relief is sought, such dispute may be submitted to a court of competent jurisdiction sitting in equity who may issue injunctive relief or other equitable remedy.[2]

According to the School District's amended petition, under the Restoration Agreement, CONTRACTOR was "to remove debris from its premises and perform remediation and restoration services following clean up." The Restoration Agreement specifically authorized the use of subcontractors and provided for payment in accordance with a rate schedule. The Restoration Agreement also authorized the use of "a particular trade or service" on a "cost plus 10% overhead and 10% profit" basis if there was a "specific need" because CONTRACTOR did not provide those services.

---

[1] For purposes of this opinion, the background facts are taken largely from the School District's original petition.

[2] Emphases added.

2

The debris removal occurred from approximately September 18, 2008, through September 29, 2008. Remediation occurred through the end of October 2008. CONTRACTOR invoiced the School District, and its invoices reflected work performed by Cottonwood Debris Company, LLC (hereinafter "SUBCONTRACTOR"). The School District questioned the invoices; the relationship between CONTRACTOR and SUBCONTRACTOR; and the characterization of SUBCONTRACTOR as a "subcontractor," which gave rise to the higher billing under the Restoration Agreement.

CONTRACTOR sent its final invoice in December 2008, but persisted in billing SUBCONTRACTOR'S services as a subcontractor. The School District refused to pay the 20% markup associated with SUBCONTRACTOR'S characterization as a subcontractor because it had determined that SUBCONTRACTOR was an entity "closely related to" CONTRACTOR.

In the subsequent negotiations over SUBCONTRACTOR'S invoices, SUBCONTRACTOR provided the School District with documentation to support certain fuel charges billed by SUBCONTRACTOR. The School District determined that these were fraudulent or fabricated invoices. Further, SUBCONTRACTOR included in its billings a $6,000 per campus charge for "food disposal services." SUBCONTRACTOR could not back these charges up with supporting documentation; the School District determined from its own records that the services had not been performed at all. SUBCONTRACTOR'S billings included a $170.73 per cubic yard charge for debris removal that was three times the cost permitted by Federal Emergency Management Agency ("FEMA"), to whom the School District was applying for reimbursement. The School District informed FEMA that it had concerns about the "authenticity of the underlying invoices from [SUBCONTRACTOR]." FEMA denied the School District's application, resulting in the loss of $700,000 in FEMA reimbursements.

Prior to this suit, and as alleged in the School District's petition, CONTRACTOR and SUBCONTRACTOR were "merged out of existence" to form SURVIVING

3

COMPANY. Thus, when, on December 1, 2010, the School District filed suit arising from the previously described conduct by SUBCONTRACTOR, the School District named only SURVIVING COMPANY. Specifically, its claims are for fraud and money had and received.

On May 18, 2011, SURVIVING COMPANY filed its motion to stay and compel arbitration of the School District's claims. In its motion to stay and to compel arbitration, SURVIVING COMPANY stated that it had not formally asserted its counterclaims for the School District's failure to pay $705,123 in the action pending in the trial court because of the arbitration clause in the Restoration Agreement. Instead, in its draft statement of claim and demand for arbitration filed with the American Arbitration Association, which was attached to its motion to compel arbitration, SURVIVING COMPANY asserted causes of action for breach of contract and violations of the Prompt Pay Act for failing to pay $705,123.

On March 1, 2012, the trial court (1) denied SURVIVING COMPANY'S motion to stay and compel arbitration with respect to the School District's claims against SURVIVING COMPANY; and (2) granted SURVIVING COMPANY'S motion to stay and compel arbitration with respect to SURVIVING COMPANY'S counterclaims against the School District.

On April 23, 2012, the trial court made the following findings of fact:

1. After Hurricane Ike made landfall, Clear Creek Independent School District (CCISD) and Cotton Commercial USA, L.P. d/b/a Cotton USA (Cotton USA) entered into a contract for hurricane remediation.

2. CCISD and Cotton USA's contract contained on [sic] arbitration provision.

3. Cotton USA employed a subcontractor, Cottonwood Debris Company, LLC, to perform some hurricane remediation for CCISD.

4

4. Cottonwood was not a party [to] or a signatory to the contract between Cotton USA and CCISD.

5. Cottonwood was not a party to or a signatory to the arbitration agreement between Cotton USA and CCISD.

6. Cottonwood and Cotton USA merged into a single entity in September 2010, Cotton Commercial USA, Inc. f/k/a Cottonwood Debris Company, LLC, (Cotton Commercial).

7. In December 2010, CCISD filed suit against Cotton Commercial asserting claims related to Cottonwood's hurricane remediation work.

8. Cotton Commercial failed to present any evidence demonstrating that Cottonwood and CCISD were signatories to an arbitration agreement.

9. Cotton Commercial failed to present any evidence demonstrating that Cottonwood was an intended third-party beneficiary of the contract between CCISD and Cotton USA.

The trial court also reached the following conclusions of law:

1. In the absence of an agreement to arbitrate, a party cannot be compelled to arbitrate a claim.

2. A non-signatory to an arbitration agreement cannot compel a party to proceed to arbitration.

3. The party moving to compel arbitration bears the burden of proving the existence of an enforceable arbitration agreement.

SURVIVING COMPANY appeals the trial court's order denying its motion to compel arbitration of the School District's claims. The School District has not appealed the trial court's order granting SURVIVING COMPANY'S motion to compel arbitration of its claims against the School District.

5

## II. ANALYSIS

On appeal, SURVIVING COMPANY contends that the trial court erred in denying its motion to compel arbitration of the School District's claims.[3]  The School District asserts that its claims are actually against SUBCONTRACTOR, but it only sued SURVIVING COMPANY because SUBCONTRACTOR ceased to exist after the merger.  The School District maintains that it cannot be compelled to arbitrate its claims against SUBCONTRACTOR because there is no agreement to arbitrate between the School District and SUBCONTRACTOR.  The trial court determined that there was no valid arbitration agreement.  We reverse the portion of the trial court's order denying arbitration of the School District's claims.

### A.  Whether an Agreement to Arbitrate Exists

A party must establish the existence of a valid arbitration agreement, and that the claims fall within the scope of that agreement.  *In re Dilliard Dep't Stores, Inc.*, 186 S.W.3d 514, 515 (Tex. 2006) (orig. proceeding) (per curiam); *McReynolds v. Elston*, 222

---

[3] Although SURVIVING COMPANY relied only on the Texas General Arbitration Act (TAA) when it moved in the trial court to compel arbitration, it has asserted on appeal that both the TAA and the Federal Arbitration Act (FAA) are applicable.  *See* 9 U.S.C. §§ 1–16 (West 2009) (FAA); TEX. CIV. PRAC. & REM. CODE ANN. §§ 171.001–.098 (West 2011) (TAA).  The School District asserts that SURVIVING COMPANY has waived its argument that the FAA applies because it is being raised for the first time on appeal.  Prior to September 1, 2009, whether the TAA or the FAA applied was relevant to determining an appellate court's jurisdiction when a party complained of an order denying arbitration: mandamus was the proper remedy when the FAA governed, while interlocutory appeal was the procedure under the TAA.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 171.098 (providing for interlocutory appeal of orders denying arbitration under the TAA); *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130 (Tex. 2005) (orig. proceeding) (explaining that mandamus was the proper remedy to enforce an arbitration agreement under the FAA).  The Texas Civil Practice and Remedies Code now provides for the interlocutory appeal of a trial court's denial of a motion to compel arbitration under the FAA.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.016 (West Supp. 2012).  Therefore, parties are no longer required to pursue such "parallel proceedings" when appealing an order denying arbitration under the TAA and the FAA.  Whether this case is governed by the FAA or the TAA, our disposition is the same.  *See Aspen Tech., Inc. v. Harrity*, No. 01-11-00925-CV, 2012 WL 897778, at *2 n.1 (Tex. App.—Houston [1st Dist.] Mar. 15, 2012, no pet.) (mem. op.) (stating outcome of appeal would be the same under the FAA and TAA); *see also Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 56 n.10 (Tex. 2008) (stating that whether a case is governed by the FAA or TAA, "many of the underlying principles are the same; where appropriate, this opinion relies interchangeably on cases that discuss the FAA and TAA").

S.W.3d 731, 739 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Whether a valid arbitration agreement exists is a legal question subject to de novo review. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003).

The parties agree and the trial court determined that there is an arbitration provision in the Restoration Agreement between CONTRACTOR and the School District. There is, however, no arbitration agreement between the School District and SUBCONTRACTOR. Contrary to appellant's suggestion, SURVIVING COMPANY is not a signatory to the Restoration Agreement. Moreover, contrary to appellee's insistence that its claims are "really against" SUBCONTRACTOR, the School District's claims are and must be against SURVIVING COMPANY, not SUBCONTRACTOR. *See Bailey v. Vanscot Concrete Co.*, 894 S.W.2d 757, 759 (Tex. 1995) ("Civil suits may be maintained only by or against parties having an actual legal existence."); *Smith v. CDI Rental Equip., Ltd.*, 310 S.W.3d 559, 565 (Tex. App.—Tyler 2010, no pet.) (explaining that one of two named plaintiffs ceased to exist after it had merged with another entity and, therefore, had no actual or legal existence).

Generally, an arbitration agreement is only enforced between signatories to the agreement. *Van Zanten v. Energy Transfer Partners, L.P.*, 320 S.W.3d 845, 847 (Tex. App.—Houston [1st Dist.] 2010, no pet.). However, the trial court's bright-line conclusion that a nonsignatory to an arbitration agreement cannot compel a signatory to arbitrate is clearly incorrect. "[S]ometimes a person who is not a party to the agreement can compel arbitration with one who is, and vice versa." *Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 305 (Tex. 2006) (footnotes omitted). Texas courts recognize several circumstances in which signatories may compel nonsignatories to arbitrate claims covered by an arbitration agreement and vice versa.[4] Thus, the question presented here is

---

[4] As the Texas Supreme Court stated most concisely: "Several rules of law and equity may bind nonsignatories to a contract. For example, we have held that the principles of equitable estoppel and agency may bind nonsignatories to an arbitration agreement." *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 644 (Tex. 2009) (orig. proceeding); *see also id.* at 644–47 (holding that nonsignatory, wrongful death beneficiaries were bound by the decedent's arbitration agreement); *In re Merrill Lynch Trust Co.*

whether this case falls within one of the circumstances in which Texas courts recognize an arbitration agreement as binding between a signatory and a nonsignatory. We hold that there is valid arbitration agreement binding upon the School District.

A corporate relationship between SURVIVING COMPANY, CONTRACTOR, and SUBCONTRACTOR, standing alone, is insufficient to compel arbitration. *See In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d at 191. However, the Texas Supreme Court recognizes an "intertwined-claims" test that has been applied by other courts in circumstances where a nonsignatory defendant has a "close relationship" with one of the signatories and the claims are "'intimately founded in and intertwined with the underlying contract obligations.'" *Id.* at 193–94 (quoting *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995)). By this exception, the court rejected "strategic pleading" to avoid arbitration. *See id.* at 194; *see also Grigson*, 210 F.3d at 527 ("'When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate.'" (quoting *M/S Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999))).

The Texas Supreme Court has also applied the "intertwined-claims" test to prevent a signatory plaintiff from "having it both ways." *See Meyer*, 211 S.W.3d at 307–08. In *Meyer*, a motor vehicle manufacturer exercised its right of first refusal to acquire its dealer's business and then transferred its right to an assignee, thereby preempting the

---

*FSB*, 235 S.W.3d 185, 191–95 (Tex. 2007) (orig. proceeding) (recognizing that estoppel may bind a nonsignatory to an arbitration agreement but holding that plaintiffs were not bound to arbitration agreement under "concerted misconduct estoppel" because it was not a recognized theory of estoppel under Texas law); *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005) (orig. proceeding) (noting that nonsignatories may be bound to arbitration agreement under "direct benefits estoppel"); *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 755–56 (Tex. 2001) (orig. proceeding) (holding that a nonsignatory who sues based on a contract subjects himself to the contract's terms, including its arbitration agreement). The U.S. Court of Appeals for the Fifth Circuit has held that nonsignatory defendants may compel a signatory plaintiff to arbitration. *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 526 (5th Cir. 2000).

dealer's agreement with another buyer. *Id.* at 304. The thwarted buyer sued the manufacturer and the assignee for interference with the buyer's Purchase and Sales Agreement ("PSA") with the dealer. *Id.* These defendants demanded arbitration based upon the arbitration provision within the PSA—to which they were not signatories. *Id.* at 304–05. The trial court refused arbitration; the court of appeals affirmed. *Id.* at 305.

The supreme court reversed and ordered the buyer's claims in *Meyer* arbitrated, in part, under a theory of intertwined claims. Specifically, the court examined the court of appeals' determination that the claims were not intertwined and found that determination to be "simply wrong." *Id.* at 307. Instead, the supreme court held arbitration to be proper between the signatory (buyer) and the nonsignatories (manufacturer and assignee) because the buyer was "asserting rights that it would not have but for the PSA, but refusing to honor its agreement to arbitrate disputes over those rights." *Id.* at 308.

The circumstances of this case more compellingly signal arbitration than those of *Meyer*. The School District's pleadings outline the Work performed under the Restoration Agreement and detail the initial dispute over characterization of SUBCONTRACTOR as a subcontractor, as that term is defined under the agreement. Because of that initial dispute, SUBCONTRACTOR undertook to explain its billings—forwarded through CONTRACTOR—in further detail. When CONTRACTOR provided the detailed invoices, now alleged to be false, fraudulent, and inflated, the School District sued. The School District's dispute with SURVIVING COMPANY over SUBCONTRACTOR'S billings is even more significantly intertwined with the Restoration Agreement than the buyer's claims against the manufacturer and assignee were with the PSA in *Meyer*.

Moreover, the broad arbitration provision in the Restoration Agreement covers "[a]ny controversy, dispute or claim arising out of this Agreement or the Work done hereunder." The trial court made the finding of fact that CONTRACTOR hired SUBCONTRACTOR "as subcontractor to perform some remediation work for [the

9

School District].” The trial court further made a finding of fact that the School District filed suit asserting “claims related to [SUBCONTRACTOR’S] hurricane remediation work.” The School District does not challenge these findings.

In support of its claims for fraud and money had and received, the School District alleged in its petition that (1) SUBCONTRACTOR fabricated gasoline invoices for amounts of gasoline that were not delivered to SUBCONTRACTOR; (2) SUBCONTRACTOR did not remove and dispose of spoiled food at six out of the thirty-eight campuses; (3) SUBCONTRACTOR engaged in price gouging by invoicing the School District for debris removal at a rate that was “nearly triple the highest cost allowable by FEMA”; and (4) FEMA denied the School District’s application for reimbursement for debris removal costs because of “fraudulent underlying invoices” from SUBCONTRACTOR.

The School District never had a contract with SUBCONTRACTOR. Thus, any right the School District has to recover damages for the outlined claims depends on the Restoration Agreement because SUBCONTRACTOR’S obligations to the School District arise from the Restoration Agreement. For example, SUBCONTRACTOR had no obligation to provide invoices but for its Work under the Restoration Agreement. Similarly, if SUBCONTRACTOR had an obligation to set prices for the Work within a FEMA guideline, such obligation arises from the Restoration Agreement.[5] In fact, the Restoration Agreement speaks to “indirect costs associated with mobilization and management of the related recovery services,” and Exhibit A to the Restoration Agreement is a detailed rate schedule. The School District’s claim that SUBCONTRACTOR claimed to have provided spoiled food (debris) removal that it did

_____

[5] In its response to SURVIVING COMPANY’S motion to compel arbitration, the School District acknowledged that it demanded that both SUBCONTRACTOR AND CONTRACTOR repay the amounts FEMA did not reimburse prior to releasing any final payment under the Restoration Agreement. Although the School District argues that it resolved its dispute with CONTRACTOR, the School District’s failure to pay the $705,123 balance on CONTRACTOR and SUBCONTRACTOR invoices because it was not reimbursed by FEMA is **the claim** ordered to arbitration by the trial court.

10

not perform is a failure to perform under the Restoration Agreement. Therefore, the School District's claims are completely interwoven with the Restoration Agreement.

The School District is a signatory to the Restoration Agreement. The School District agreed to arbitrate "*any controversy, dispute or claim arising out of [the Restoration Agreement] or the Work done [thereunder].*"[6] The School District cannot artfully choose its defendant or plead its claims to avoid arbitration. *See In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d at 188.

The School District urges that permitting SURVIVING COMPANY to enforce the arbitration clause is bad policy because it means that a company can avoid a jury trial simply by merging into a company with an arbitration clause before it is sued. Here, however, it is the School District's pleading of the facts underlying its claims[7] that has controlled the determination that its claims are intertwined with and dependent upon the Restoration Agreement. More importantly, the School District's fear is belied by the independent, second prong of the analysis—the dispute must fall within the scope of the arbitration clause.

Under the unique circumstances of this case, there is a greater policy concern arising from litigation of some claims under the Restoration Agreement and arbitration of others, all between the same two parties. The School District does not appeal the trial court's order that it arbitrate the Restoration Agreement claims of SURVIVING COMPANY—a nonsignatory—against the School District. But the School District urges that its claims arising directly from Work performed under the Restoration Agreement against the same nonsignatory cannot be compelled to arbitration. On this record, therefore, SURVIVING COMPANY is arbitrating its alleged breach of contract claims

---

[6] Emphasis added.

[7] In fact, the School District devotes half of the factual background in its petition to outlining the terms of the Restoration Agreement and its receipt of "Invoices From a Sham 'Subcontractor'— Cottonwood Debris Company, LLC—With a 20% Markup." The propriety of the markup for work performed by Cottonwood as a subcontractor cannot be characterized as anything other than a dispute under the Restoration Agreement.

11

against the School District, yet the School District is litigating its complaints regarding invoices and performance that could be characterized as also defensive to the contract claims. It would be contrary to Texas policy favoring arbitration and against artful pleading to avoid arbitration to allow the School District to avoid its agreement to arbitrate claims or to piecemeal such claims in two forums simply because its contracting counterpart has merged with another company.

## B. Scope of the Arbitration Agreement

We now turn to the School District's assertion that its claims for fraud and money had and received do not fall within the scope of the arbitration agreement.

In determining whether a claim falls within the scope of an arbitration agreement, we focus on the factual allegations of the complaint rather than the causes of action asserted. *Prudential Sec., Inc. v. Marshall*, 909 S.W.2d 896, 900 (Tex. 1995) (orig. proceeding) (per curiam). The party opposing arbitration has the burden to show that the claims fall outside the scope of the arbitration agreement. *Id.* Courts must resolve any doubts about an arbitration agreement's scope in favor of arbitration. *In re FirstMerit Bank, N.A.*, 52 S.W.3d at 753. A court should not deny arbitration unless it can be said with positive assurance that an arbitration agreement is not susceptible to an interpretation that would cover the dispute at issue. *McReynolds*, 222 S.W.3d at 740.

The presumption of arbitrability is particularly applicable where the clause is broad; that is, it provides for arbitration of "any dispute arising between the parties," or "any controversy or claim arising out of or relating to the contract thereof," or "any controversy concerning the interpretation, performance or application of the contract." *Babcock & Wilcox Co. v. PMAC, Ltd.*, 863 S.W.2d 225, 230 (Tex. App.—Houston [14th Dist.] 1993, writ denied). "In such instances, absent any express provision excluding a particular grievance from arbitration, only the most forceful evidence of purpose to exclude the claim from arbitration can prevail." *Id.*

12

If the facts alleged "touch matters," have a "significant relationship" to, are "inextricably enmeshed" with, or are "factually intertwined" with the contract containing the arbitration agreement, the claim is arbitrable. *Pennzoil Co. v. Arnold Oil Co.*, 30 S.W.3d 494, 498 (Tex. App.—San Antonio 2000, orig. proceeding) (citing *Hou-Scape, Inc. v. Lloyd*, 945 S.W.2d 202, 205–06 (Tex. App.—Houston [1st Dist.] 1997, orig. proceeding)). However, "[i]f the facts alleged in support of the claim stand alone, are completely independent of the contract, and the claim could be maintained without reference to the contract, the claim is not subject to arbitration." *Id.* (citing *Fridl v. Cook*, 908 S.W.2d 507, 511 (Tex. App.—El Paso 1995, writ dism'd w.o.j.)).

We conclude that the School District's claims for fraud and money had and received fall within the scope of the arbitration agreement. The arbitration agreement provides for arbitration of "[a]ny controversy, dispute or claim arising out of this Agreement or the Work done hereunder." The School District's claims are based on SUBCONTRACTOR'S alleged (1) fabrication of gasoline invoices submitted to substantiate charges for Work performed under the Restoration Agreement; (2) failure to perform the actual removal/disposal of food at several campuses for which it had submitted invoices under the Restoration Agreement; and (3) price gouging by charging an inflated rate for Work performed under the Restoration Agreement in which rates are established by the Restoration Agreement. Therefore, the School District's claims "touch matters," have a "significant relationship" to, are "inextricably enmeshed" with, and are "factually intertwined" with the Restoration Agreement, and cannot stand alone.

## III. CONCLUSION

We conclude that the trial court erred by not compelling arbitration of the School District's claims against SURVIVING COMPANY—Cotton Commercial USA, Inc.— and sustain its first issue.[8] Accordingly, we reverse that part of the trial court's order

---

[8] SURVIVING COMPANY also initially asserted that the trial court erred by denying its motion to stay the trial court proceedings. On May 25, 2012, after SURVIVING COMPANY filed its opening

denying arbitration of Clear Creek Independent School District's claims against Cotton Commercial USA, Inc. and remand to the trial court for proceedings consistent with this opinion, and affirm the remainder of the order.


/s/      Sharon McCally
                Justice


Panel consists of Justices Boyce, Christopher, and McCally.

---

brief in this court, the trial court granted the parties' joint motion to stay the case. Therefore, we need not address this contention.

SURVIVING COMPANY also brought a second issue in this appeal, in which it contends that, if this court determines that disputed fact issues exist, then the trial court erred by failing to conduct an evidentiary hearing. Because we hold that the trial court erred by not compelling arbitration, we need not address the second issue.