TEXAS COASTAL BANK, Pasadena, Texas and First Bank of Deer Park, Deer Park, Texas, Appellants,

v.

FINANCE COMMISSION OF the STATE OF TEXAS, Appellee.

No. 03-94-00378-CV.

Court of Appeals of Texas, Austin.

March 29, 1995.

B. Daryl Bristow [Signed brief], Bristow Hackerman Wilson & Peterson, P.C., Houston, for appellants.

Dan Morales, Atty. Gen., Barbara J. Szalay [Signed brief], Asst. Atty. Gen., Financial Litigation Div., Austin, for appellee.

Before ABOUSSIE, JONES and KIDD, JJ.

KIDD, Justice.

Appellants Texas Coastal Bank and First Bank of Deer Park ("the Banks") appeal from a judgment entered by the trial court, which affirmed appellee Finance Commission's ("the Commission") cease and desist orders issued by the Commissioner of Banking. The Commissioner issued the orders based on her conclusion that the Banks had exceeded their lending limits and conducted business in an unsafe and unsound manner. By eleven points of error, the Banks appeal. We will affirm the trial court's judgment.

## BACKGROUND

In December of 1991, examiners from the Federal Reserve Bank of Dallas examined the records of Texas Coastal Bank and the FDIC began an investigation of First Bank of Deer Park. These investigations revealed that each bank had loaned large amounts of

money to Jerry and Jean Moore and to eighteen corporations controlled by Jerry Moore ("the corporations"). The examiners concluded that each bank had exceeded its legal lending limit[1] and that the loans constituted unsafe and unsound concentration of credit.[2] The federal examiners subsequently notified the Texas Department of Banking of their findings and conclusions. The Department ultimately reached the same conclusions as the federal examiners. The Banking Commissioner then issued cease and desist orders, which the Finance Commission affirmed. The Banks sought judicial review, and the trial court affirmed the Commission's decision.

The Banks appeal by eleven points of error, arguing that the Commission exceeded its statutory authority, the Commission's conclusions are not supported by substantial evidence in the record, the Commission acted arbitrarily and capriciously, and the Commission violated the Banks' federal and state due process rights.

## DISCUSSION

In points of error one, two, three, five and six, the Banks raise various challenges under the Administrative Procedure Act to the Commission's conclusions concerning the Banks' legal lending limits violations. *See* Tex.Gov't Code Ann. §§ 2001.174(2)(B), (E), (F) (West 1995) (hereinafter "APA"). The Banks contend that the Commission exceeded its statutory and regulatory authority, its orders were not supported by substantial evidence, and it acted arbitrarily and capriciously in ordering the Banks to reduce the amount of credit they had concentrated in Moore and the corporations.

■ Under Article 342–507 of the Banking Code, "[t]he total loans and extensions of credit by a state bank to a person outstanding at one time may not exceed twenty-five per cent (25%) of its capital and certified surplus." Texas Banking Code, Tex.Rev.Civ. Stat.Ann. art. 342–507(b) (West Supp.1995) (hereinafter "Banking Code"). The article

specifically defines the term "person" to include a corporation. *Id.* § (a)(2). The parties do not dispute that if the loans were aggregated, the amount of the aggregated loans would exceed the legal lending limit for each bank—more than ten times the legal limit for Texas Coastal and seventeen times the amount Deer Park is legally allowed to lend to one borrower. Therefore, the principal dispute in this cause concerns whether the loans were properly aggregated and attributed to Moore.

Article 342–507 grants the Banking Commissioner the authority to "prescribe rules to administer and carry out this Article." Banking Code art. 342–507(d). In 1986, the Banking Commissioner promulgated rules for assessing whether loans to one person should be attributed to another:

(a) General rule. Loans or extensions of credit to one person will be attributed to other persons for purposes of lending limit determinations under [Article 342–507] when:

(1) the proceeds of the loans or extensions of credit are to be used for the *direct benefit* of the other person or persons (the term "direct benefit" shall include situations in which the proceeds of a loan or extension of credit to one person are to be loaned or contributed by such person to another person); *or*

(2) the *expected source of repayment* for each loan or extension of credit is the same for each person.

7 Tex.Admin.Code § 12.4(a) (1994) (hereinafter "TAC") (emphasis added). An affirmative finding as to either the direct benefit test or the expected source of repayment test will support the aggregation and attribution of loans under section 12.4.

In their first, second, and third points of error, the Banks contend that the Commission has created new rules for loan aggregation that exceed its statutory authority because the rules go beyond the "sole applica-

---

1. The legal lending limit is the maximum amount of money that a bank may lend to one borrower. Texas Coastal's legal lending limit is $500,000 and Deer Park's is $550,000.

2. Concentration of credit concerns whether a bank's lending practices are dangerously concentrated in one industry, type of business, or geographical area.

ble loan limitations" provided for in Article 342–507 and section 12.4 of the Administrative Code. Banking Code art. 342–507(c); 7 TAC § 12.4(a). Although the Commissioner may "prescribe rules to administer and carry out [Article 342–507] ... or to establish limits or requirements other than those specified in this Article," Banking Code art. 342–507(d), the Commissioner must follow the APA's rulemaking procedures. *See* APA §§ 2001.021–.038. The Banks argue that the Commissioner and the Commission failed to follow previously promulgated rules in determining whether the loans should be aggregated because they applied an *indirect* benefit test and ignored the requirement to consider what the Banks viewed as the *expected* source of repayment. *See* 7 TAC § 12.4(a).

The Commission responds that it did not promulgate new standards for loan attribution, but instead applied the direct benefit and expected source of repayment tests. The Commission's findings and conclusions indicate that the Commission relied on the section 12.4 tests in analyzing whether the Banks had exceeded their legal lending limits. Because the Commission actually used these tests, we conclude that neither the Commissioner nor the Commission promulgated new standards for loan aggregation and applied them to the Banks in excess of its statutory authority. We overrule the Banks' first, second, and third points of error.

■ The Banks' fifth and sixth points of error allege that substantial evidence in the record does not support the Commission's conclusions that Moore received a direct benefit and that Moore was the expected source of repayment. In performing a substantial evidence review, appellate courts accord much deference to an administrative agency's expertise. "The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency." *Texas Health Facilities Comm'n v. Charter*

*Medical—Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex.1984). We must uphold the agency's decision if the evidence is such that reasonable minds could have reached the same conclusions that the agency reached. *Id.* at 453. The evidence may actually preponderate against the agency's decision, yet constitute substantial evidence. *Lewis v. Metropolitan Sav. & Loan Ass'n*, 550 S.W.2d 11, 13 (Tex.1977). A reviewing court is not permitted to substitute its judgment for that of the agency. *Texas State Bd. of Dental Examiners v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988), *cert. denied*, 490 U.S. 1080, 109 S.Ct. 2100, 104 L.Ed.2d 662 (1989). "The findings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise." *Charter Medical*, 665 S.W.2d at 453 (citing *Imperial Am. Resources Fund, Inc. v. Railroad Comm'n*, 557 S.W.2d 280, 286 (Tex. 1977)). If the record evidence would support either an affirmative or negative finding, we must affirm the agency's decision. *Auto Convoy Co. v. Railroad Comm'n*, 507 S.W.2d 718, 722 (Tex.1974).

■ The Banks argue in their fifth point of error that the record does not contain substantial evidence to support the conclusion that Moore received a direct benefit. The evidence concerning the loans is as follows. Between June 28, 1991 and October 9, 1991, First National Bank of Bellaire, the originating bank, made one loan to Jerry Moore and his wife, Jean, and a series of loans to the corporations. Moore, a shopping center developer, created the corporations and selected certain shopping centers he owned to be sold to the corporations as part of an estate planning strategy.[3]

The Banks purchased participation in the loans from First National, relying upon the recommendations of C.R. Vickery and G. Warren Coles. Vickery was senior chairperson of the Board at First National and chair-

---

**3.** The Commission insinuates that Moore created the corporations to circumvent the Banks' legal lending limits. The rules governing the loans at issue here, however, do not require an examination of Moore's subjective intent or the propriety of his actions. We are limited to determining whether Moore received a direct benefit from the loans or whether the Banks expected Moore to be the source of repayment. Therefore, we decline to address whether Moore created the corporations as part of a scheme to avoid the Banks' legal lending limits.

person of the board at Deer Park. Coles, who had experience as a real estate appraiser, served as president and chairperson of the board at First National and as chairperson of the board at Texas Coastal. After Moore selected the shopping centers to be conveyed to the corporations, Vickery determined that a maximum of $2.5 million could be loaned to each corporation. Because First National's legal lending limit was $1 million, the loans had to be participated out to other banks.

Coles and Vickery visited the centers, performed appraisals, and concluded that each property's market value exceeded the proposed loan amount. Coles then telephoned the Banks' presidents and recommended that each participate in the loans. Based upon this recommendation, each president decided to participate without reviewing any documentation or performing any independent analysis of the loans. At the time the loans were made to the corporations, the Moores were the sole shareholders.[4] With this record evidence in mind, we now turn to the Commission's application of the direct benefit and expected source of repayment tests.

The Banks assert that Moore received only an indirect benefit from the loans to the corporations because there was a reasonably equivalent exchange of value, i.e., the shopping centers for the loan proceeds. Indeed, the Banks argue that Moore received *less* than a reasonably equivalent exchange of value because he sold the centers for less than their market values; therefore, the corporations received a direct benefit while Moore suffered a detriment.[5]

The Banks' argument is premised on identical "direct benefit" language found in the Code of Federal Regulations. 12 C.F.R. § 32.5(a)(1) (1994). In interpreting this language, the Office of the Comptroller of the Currency (OCC) determined that a direct benefit accrues when loan proceeds are transferred "to another person *without* a reasonably equivalent exchange of value." 54 Fed.Reg. 43398, 43410 (Oct. 24, 1984) (emphasis added). The Federal Register, however, also explicitly mandates that the "OCC retains authority to require attribution, under the general benefit rule, in other situations *when warranted by the facts and circumstances.*" *Id.* (emphasis added). In a similar fashion, Article 342–507(d) gives the Banking Commissioner discretion to determine if "a loan putatively made to a person shall . . . be attributed to another person." Banking Code art. 342–507(d). Therefore, the Commission correctly asserts that application of the direct benefit test is not limited *solely* to examining whether there was an equivalent exchange of value.

The Commission argues that the record contains substantial evidence to support its determination that Moore directly benefitted from the loan transactions. Because the Moores were both the seller of the centers and the corporations' sole shareholders, the Commission contends that Moore received a direct benefit. The record indicates that Moore received $20,228,010 in loan proceeds as a result of the sales of the shopping centers, he continued to own the shopping centers because Moore and his wife were the corporations' sole shareholders at the time the loans were made, and Moore was released from direct liability on a prior outstanding debt of $20,906,021.[6]

---

**4.** The Moores transferred portions of the stock to their two children *after* the loans had been approved.

**5.** The Commission notes that the record contains conflicting evidence regarding whether the corporations actually bought the properties for less than market value. The Commission questioned the appraisals of David Caldwell, an outside appraiser who is a friend of Moore's. Many of Caldwell's appraisals were incomplete at the time that the loans were made; the Banks made loans to corporations owning only portions of subdivided centers, yet the loan files for those centers reflected rentals on the entire center; Caldwell's appraisals were based on projected rentals rather than actual rentals; and the centers' insurance coverage was inadequate to cover the appraised values of the properties.

**6.** Michael Mancusi, managing director of a financial institutions consulting firm, testified about the transactions:

The benefits of these loans—the proceeds of the loans accrued to the benefit of one individual, and that was Mr. and Mrs. Moore.... [T]he Moores received, as I recall, somewhere in the neighborhood of 20 million or more of the proceeds of these loans to repay outstanding liens on the loans at the time these new

We conclude that substantial evidence in the record supports the Commission's determination that Moore received a direct benefit. *See Charter Medical,* 665 S.W.2d at 452–53. The Banks' contention that Moore received no direct benefit because he sold the centers to the corporations for less than market value is undermined by the fact that Moore stood on both sides of the transactions as buyer and seller, and benefitted from the loan proceeds.[7] We overrule the Banks' fifth point of error.

■ In their sixth point of error, the Banks contend that the Commission's conclusion that Moore was the expected source of repayment is not supported by substantial evidence in the record. *See* 7 TAC § 12.4(a)(2). The Banks specifically argue: "Section 12.4(a) requires an inquiry into the lender's *expectations* when the loans are made. It also requires that the repayments were expected to come from *the same source.* The State brushed aside both core requirements. It relied on evidence that did not even exist when the Loans were made, and therefore could not have affected expectations when the Loans were initiated...." The Banks correctly assert that, similar to the direct benefit analysis, the relevant time period for determining the expected source of repayment is when the loans were made. Therefore, we must decide whether substantial evidence supports the Commission's conclusion that Moore was the expected source of repayment at the time the loans were approved.

The record contains evidence that Moore negotiated the loans on behalf of the corporations, and that Moore and his wife personally guaranteed each loan. Under the banking regulations, however, loans are not attributed to a guarantor for determination of lending limit violations simply because of the individual's status as guarantor. *See* 7 TAC § 12.2 (primary obligor's failure to perform "shall not result in any lending limit violation on behalf of the guarantor"). We must examine whether the Banks considered Moore as the source of repayment even in the absence of any corporation's nonperformance.

At the time of the loan transactions, the Moores were the corporations' sole shareholders. Ninety percent of the corporations were formed within one week of their respective loan approvals; ten corporations were formed either the day before or the same day as their respective loans were granted. The Federal Reserve Bank analyzed the cash flow of the shopping centers using information available to, but not analyzed by, the Banks at the time they granted the loans. The Federal Reserve's analysis indicated that more than half of the shopping centers had a negative cash flow when the loans were made. The loans have been serviced by J.J.M. Management, Inc., a corporation wholly owned by the Moores, which advances money to the corporations to service the debt. The Moores are obligated to repay any money that the corporations cannot reimburse to J.J.M.

In addition, the files for these loan transactions were incomplete at the time most of the loans were approved. The Banks argue that this inadequate documentation provides insufficient evidence to support the conclusion that the Banks looked to Moore as the expected source of repayment. They contend that the Commission erroneously refused to focus on Vickery's and Coles's subjective expectations at the time the loans were approved. The Banks predicate their contention on Vickery's and Coles's testimony that they personally investigated the loan transactions and concluded that each loan would perform, and urge that Vickery's and Coles's statements about their expectations of the source of repayment are the only reliable sources of information regarding those expectations.

loans were made and also for other purposes.... This individual owned these assets and set up separate corporations to take title to them ... and sold the assets to these corporations that he set up which he in turn owns or owns with his family. Then the benefits—I mean, the loan proceeds pass back to the Moores.

7. Furthermore, the testimony on market value is disputed, and we conclude that there is substantial evidence to support a finding by the Commission that the properties were not conveyed to the corporations at less than market value.

The Commission, however, questioned the adequacy of Vickery's and Coles's appraisals of the properties. Coles did not have tax, lease, or cash flow information when he performed some of the appraisals, and was unable to present any documentation showing how he determined the centers' values because he had discarded all calculations used in formulating his appraisals. Coles testified that he was unaware of whether the corporations were liquid, of the amount of each corporation's cash flow, of whether the corporations were subsidiaries of another company, and of the identity of the borrowing corporations until a few days before the loans were closed. He testified that he knew Moore was the president of each corporation, and that Moore had promised that each center would have sufficient cash flow to service its debt. When questioned whether he would believe documentation about cash flow that contradicted Moore's statements, Coles replied, "I rely on his statement as to what the cash flow will be."

The evidence clearly conflicts. Vickery and Coles testified that they considered the corporations as the expected source of repayment. The Commission, however, presented evidence of the lack of documentation and information that Vickery and Coles possessed about the corporations and the insufficiency of corporate cash flow to service the debt. The Commission apparently placed little credence in Vickery's and Coles's statements because they did not adequately investigate the corporations. This lack of investigation supports the Commission's conclusions

that Vickery and Coles viewed Moore as the expected source of repayment because the Banks lacked sufficient information to determine whether the corporations were a good credit risk. The supreme court has noted: "*Resolution of factual conflicts and ambiguities is the province of the administrative body....* The reviewing court is concerned only with the reasonableness of the administrative order, not its correctness." *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex.1984) (emphasis added). Given that there is evidence to support *either* an affirmative or negative finding on the expected source of repayment, we conclude that the Commission's conclusion is supported by substantial evidence. *See Auto Convoy Co.,* 507 S.W.2d at 722.[8] The Banks' sixth point of error is overruled.

The Banks argue in their eighth and ninth points of error that the Commission violated the due process requirements of the United States Constitution and the Texas Constitution in its application of the direct benefit and expected source of repayment tests. U.S. Const. amend. XIV; Tex. Const. art. I, § 19. In their eleventh point of error, the Banks contend that because the cease and desist orders will force them to sell the loans at drastically reduced prices, the Commission has deprived them of their property without due process, i.e., notice of the aggregation standards to be applied. The Banks assert that the Commission fashioned new standards without providing notice to the Banks that it would apply an indirect benefit test

8. The Banks also argue that the record lacked substantial evidence to support the Commission's determination that the expected source of repayment was the same for each corporation. *See* 7 TAC § 12.4(a)(2). They argue that the Commission relied solely on evidence that J.J.M. Management had been managing the corporations, and that the Commission disregarded corporate separateness in examining the expected source of repayment. *In general, a corporation and its shareholders must be treated as separate legal entities. See Commonwealth v. Davis,* 140 Tex. 398, 168 S.W.2d 216, 222–23 (1942), *cert. denied,* 320 U.S. 210, 63 S.Ct. 1447, 87 L.Ed. 1848 (1943). The Banks urge that we conclude that the Commission disregarded this principle of corporate separateness.

The Commission contends that corporate separateness is an entirely different issue from wheth-

er *the Banks* violated their legal lending limits. They note that attribution of the loans to Moore under the expected source of repayment test does not affect the corporations' legal liability for the loans. The aggregation rules are merely methods to determine whether the Banks have truly diversified their risk; they do not alter the corporate status of the borrower or the protection of its shareholders from individual liability if the corporation defaults. We agree. By including corporations in the definition of "person" under Article 342–507 and section 12.2, the attribution rules are clearly intended to be applied to corporations. *See* Banking Code art. 342–507(a)(2); 7 TAC § 12.2. The Commission did not violate tenets of corporate separateness in concluding that Moore was the expected source of repayment of the loans.

and would ignore the "expected" in the expected source of repayment test. We disagree. Based on our examination of the record, the Commission clearly relied on the section 12.4 tests in determining that the loans should be aggregated and attributed to Moore. *See* Banking Code art. 342–507(d); 7 TAC § 12.4(a). The Banks were not subjected to new regulatory requirements without notice. Points of error eight, nine, and eleven are overruled.

## CONCLUSION

The record contains substantial evidence to support the Commission's determination that the loans were attributable to Moore under both the direct benefit and expected source of repayment tests. *See* APA § 2001.174(2)(E); 7 TAC § 12.4(a)(1), (2). We therefore uphold the Commission's conclusion that the Banks violated the lending limit laws. Because the Commission's cease and desist orders can be upheld on this basis, we need not address the Banks' fourth, seventh, and tenth points of error concerning the Commission's conclusion that the loans constituted an unsafe concentration of credit. The judgment of the trial court is affirmed.