INTERNATIONAL BANK OF COM-
MERCE—BROWNSVILLE, Ap-
pellant,

v.

INTERNATIONAL ENERGY
DEVELOPMENT CORP.,
Appellee.

No. 13–96–298–CV.

Court of Appeals of Texas,
Corpus Christi.

June 18, 1998.

Rehearing Overruled Dec. 30, 1998.

Gilberto Hinojosa, J.A. Magallanes, Magallanes, Sokat & Hinojosa, Brownsville, Andy A. Tschoepe II, Attorney At Law, David R. Stephens, Akin, Gump, Strauss, Hauer & Feld, San Antonio, for Appellant.

D. Patrick Long, Judith Bagley, Patton Boggs, Attorneys At Law, Rustin Polk, Attorney At Law, Dallas, Tom Fleming, Fleming, Hewitt & Olvera, Brownsville, for Appellee.

Before SEERDEN, C.J., and HINOJOSA and CHAVEZ, JJ.

## OPINION

HINOJOSA, Justice.

Appellant, International Bank of Commerce—Brownsville ("IBC"), appeals from the confirmation of an arbitration award in favor of appellee, International Energy Development Corp. ("IEDC"). By five points of error, IBC complains the arbitrators were not duly selected and appointed, the arbitrators exceeded their authority and manifestly disregarded the law, and one arbitrator failed to make vital disclosures of potentially disqualifying information, was not impartial, and engaged in misconduct during the arbitration proceedings. By four additional points, IBC contends the trial court had no authority to modify the arbitration award, violated IBC's due process rights by denying its motion to vacate and/or modify the award, improperly confirmed the untimely rendered arbitration award, and wrongfully excluded some of IBC's arbitration exhibits from the hearing. By one cross-point, IEDC contends the trial court erred by ordering an equitable remittitur of the arbitrators' award without finding there was insufficient evidence to support the award. We affirm the arbitrators' award as originally rendered.

### 1. BACKGROUND & PROCEDURAL HISTORY

Many of the underlying facts in this case, particularly relating to the loan and credit facility, are in dispute. The following is, therefore, only a summation of uncontested facts.

IEDC[1] is a Delaware corporation with its principal place of business in Texas. Its business is conditioning and selling liquified petroleum gas ("LPG"), a mixture of propane and butane purchased from assorted suppliers. Propane is moved through pipelines to IEDC's terminal facility in Brownsville, Texas. Butane is brought to the terminal by truck. The propane and butane are mixed into LPG and transferred to tanker trucks through an automated loading system for transport to the purchaser.

IEDC was a start-up company in 1994 when it negotiated with Pemex, the Mexican government-owned oil company, for sales and purchases of LPG. Pemex placed its first order for LPG on June 27, 1994, to be delivered in July 1994. Pemex refused to commit to a contract, other than on a month-to-month purchase order basis, with no minimum purchase amount, and flexible prices. IEDC did not have other customers lined up at any time prior to August 1994.

In January 1994, IEDC opened negotiations with IBC for a $9,000,000 credit facility, consisting of a $2,000,000 standby letter of credit to cover LPG suppliers, $4,000,000 to cover accounts receivable, and $3,000,000 to cover the terminal's construction. The loan was closed in June 1994. IEDC pledged all of its assets to IBC as security. IBC issued irrevocable letters of credit and made advances until August 3, 1994, when it began

---

**1.** IEDC subsequently changed its name to Penn Octane Corporation. All documents filed with the American Arbitration Association and the courts continue to use the name International Energy Development Corp.

dishonoring checks presented by IEDC's suppliers and refused to honor the letters of credit.

At that time, IEDC learned that International Bank of Commerce—Brownsville's legal lending limit was $1.35 million and that the Brownsville branch bank had been unsuccessful in engaging the participation of another IBC branch bank to make up the rest of the $9 million credit facility.

IEDC filed suit against IBC on August 23, 1994, alleging various lender liability causes of action including breach of an oral contract to loan IEDC $9 million. IEDC alleged actual damages of $104 million and statutory damages of $312 million. Pursuant to an arbitration clause, IBC moved to compel arbitration of the dispute. The trial court granted the motion on September 13, 1994.

The arbitration agreement provided that the arbitration take place under the auspices of the American Arbitration Association ("AAA") before a three-member arbitration panel appointed in accordance with AAA rules, with preference to be given to qualified retired judges. The agreement also provided that "[t]he Federal Arbitration Act shall govern the interpretation, enforcement, and proceedings pursuant to the arbitration clause in this agreement."

The AAA provided IBC and IEDC with a list of fifteen potential arbitrators and a brief background of each candidate. Each party struck five names, ranked the remainder numerically, then submitted its list to the AAA. The strike lists were not exchanged between the parties. In November 1994, the AAA informed IBC and IEDC that Wallace Ward, III, retired federal District Judge John V. Singleton, and Robert Bussian had been selected as the arbitrators.

The Notice of Appointment sent to each arbitrator calls upon the arbitrator to disclose past or present relationships:

> with the parties or their counsel, direct or indirect, whether financial, professional, social or any other kind. If any relationship arises during the course of the arbitration ... it must also be disclosed. Any doubt should be resolved in favor of disclosure.

Judge Singleton made no disclosures at any stage of the arbitration proceedings.

The arbitration hearing commenced on July 19, 1995, and concluded on August 2, 1995. On September 21, 1995, the arbitrators announced their decision. The arbitrators found that IBC had breached the contract and awarded IEDC damages in the amount of $3,246,754 and attorneys' fees in the amount of $568,000. On IBC's counterclaim, the arbitrators found that IEDC had breached the contract and awarded IBC damages in the amount of $804,016.28 and attorneys' fees in the amount of $200,000. The arbitrators found that IBC was entitled to an offset for its damages.

IEDC returned to the trial court and moved to confirm the award. IBC filed a motion to vacate the award or, alternatively, to substantially modify it. After a hearing lasting several days, the trial court denied IBC's motions and rendered judgment confirming the award. IBC subsequently filed a motion for new trial which the court also denied, but its denial was conditioned on IEDC's acceptance of a remittitur.

### 2. STANDARD AND SCOPE OF REVIEW

An arbitration award has the same effect as the judgment of a court of last resort, and a trial court reviewing the award may not substitute its judgment for the arbitrators' merely because it would have reached a different conclusion. *J.J. Gregory Gourmet Serv., Inc. v. Antone's Import Co.,* 927 S.W.2d 31, 33 (Tex.App.—Houston [1st Dist.] 1995, no writ). The parties' arbitration agreement specifically invokes the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.* (1970). Judicial review of a commercial arbitration award is extraordinarily narrow, and is limited to the provisions of sections 10 and 11 of the FAA. *Forsythe Int'l, S.A. v. Gibbs Oil Co. of Tex.,* 915 F.2d 1017, 1020 (5th Cir.1990); *Babcock & Wilcox Co. v. PMAC, Ltd.,* 863 S.W.2d 225, 229 (Tex.App.—Houston [14th Dist.] 1993, writ denied). The issue upon review of an arbitrator's award is whether the arbitration proceedings were fundamentally unfair. *Forsythe,* 915 F.2d at 1020; *Babcock,* 863 S.W.2d at 229. Fundamental fairness essentially requires that each

party have an adequate opportunity to present its evidence and arguments. *See Boston Celtics Ltd. Partnership v. Shaw*, 908 F.2d 1041, 1047 (1st Cir.1990) (citing *Hoteles Condado Beach v. Union De Tronquistas Local 901*, 763 F.2d 34, 39 (1st Cir.1985)). Although our review is *de novo*, we must give strong deference to the arbitrator and are not free to correct the arbitration award. *See McIlroy v. PaineWebber, Inc.*, 989 F.2d 817, 819–22 (5th Cir.1993) (citing *Forsythe*, 915 F.2d at 1020–21)); *Babcock*, 863 S.W.2d at 229.

### 3. FINDINGS OF FACT AND CONCLUSIONS OF LAW

■ In all but one of its points of error, IBC challenges specific findings of fact and conclusions of law made by the trial court. Findings of fact entered in a case tried to the bench are of the same force and dignity as a jury's finding. *Guerra v. Garza*, 865 S.W.2d 573, 575 (Tex.App.—Corpus Christi 1993, writ dism'd w.o.j.); *City of Clute v. City of Lake Jackson*, 559 S.W.2d 391, 395 (Tex.Civ. App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.). The trial court's findings are reviewable for legal and factual sufficiency of the evidence to support them. *Southern States Transp., Inc. v. Texas*, 774 S.W.2d 639, 640 (Tex.1989); *Blanco v. Gracia*, 767 S.W.2d 896, 897 (Tex.App.—Corpus Christi 1989, no writ); *see also House Grain Co. v. Obst*, 659 S.W.2d 903, 906, 907 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.) (challenges to trial court's findings of fact made in vacation of arbitration committee's award construed as no evidence/insufficient evidence points).

■ When we review a "no evidence" or legal sufficiency of the evidence point, we consider only the evidence and reasonable inferences that tend to support the finding, and disregard all evidence and inferences to the contrary. *Responsive Terminal Sys., Inc. v. Boy Scouts of Am.*, 774 S.W.2d 666, 668 (Tex.1989). We overrule the point and uphold the finding if we find any evidence to support the finding. *Southern States Transp.*, 774 S.W.2d at 640. However, "[w]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence,

the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

■ When we review an "insufficient evidence" or factual sufficiency of the evidence point, we consider, weigh, and examine all of the evidence which supports or undermines the finding. *Plas–Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). We set aside the verdict only when we find that the evidence standing alone is too weak to support the finding or the finding is so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

■ The trial court's conclusions of law are always reviewable. *Westech Eng'g v. Clearwater Constructors*, 835 S.W.2d 190, 196 (Tex.App.—Austin 1992, no writ). We review the court's conclusions of law to determine their correctness. *Mercer v. Bludworth*, 715 S.W.2d 693, 697 (Tex.App.— Houston [1st Dist.] 1986, writ ref'd n.r.e.), *overruled on other grounds sub. nom., Shumway v. Horizon Credit Corp.*, 801 S.W.2d 890, 894 (Tex.1991). Conclusions of law may not be reversed unless they are erroneous as a matter of law. *Mercer*, 715 S.W.2d at 697.

### 4. ARBITRATOR SELECTION, EVIDENT PARTIALITY, FAILURE TO DISCLOSE, VIOLATION OF AAA RULES

By its first and second points of error, IBC contends the arbitration panel was not selected and appointed in accordance with the AAA rules as required by the parties' agreement, and the panel exceeded its authority by not acting in conformance with the terms of the arbitration agreement. The basis of these two points also underlies IBC's contention in its third point of error that evident partiality tainted the proceedings because one arbitrator, Judge John Singleton, failed to make vital disclosures which would have disqualified him from serving as an arbitrator in this matter.

The trial court disagreed with IBC's contentions. The trial court found that (1) the

appointments and proceedings were conducted properly, (2) background information concerning Judge Singleton's background was available to IBC's attorneys before the arbitrators were selected, (3) Judge Singleton was not required to make additional disclosures, (4) no facts established an arbitrator's bias, (5) the arbitrators did not exceed or imperfectly execute their powers in deciding on the award, and (6) the award was not fundamentally unfair.

IBC's complaints focus on its allegations that Judge Singleton failed to disclose relevant background information, including his association with one of IEDC's attorneys. IBC argues that Singleton was required to make these disclosures to allow IBC to make an informed choice of arbitrators. The first alleged non-disclosure is that Judge Singleton had a close friendship with a lawyer for IEDC, Morris Atlas, whom Singleton has known for many years. Atlas referred to himself as a "close friend" of the judge. The second is the nature of a federal grand jury investigation of Singleton in 1976. IBC contends that the investigation focused on Singleton's troubled dealings with financial institutions and left him biased against banks. Because Singleton made no disclosures concerning these matters, which IBC asserts would have led it to reject him as an arbitrator, he was not qualified to serve as an arbitrator, and, therefore, not duly appointed. As a result, the arbitration was not conducted by a panel of three arbitrators as required. Because Singleton would be partial to his friend and hostile to IBC, and only two properly selected arbitrators sat on the panel, IBC argues, they exceeded their powers in conducting the arbitration. Furthermore, IBC contends, the participation of an unqualified and partial arbitrator in the determination of an award, which the remaining two arbitrators could not make without exceeding their powers, caused the award to be fundamentally unfair.

■ The party asserting evident partiality has the burden of proof. *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.,* 991 F.2d 141, 146 (4th Cir.1993); *Health Servs. Management Corp. v. Hughes,* 975 F.2d 1253, 1258 n. 3 (7th Cir.1992). The alleged partiality must be "direct, definite, and capable of demonstration rather than remote, uncertain or speculative." *Hughes,* 975 F.2d at 1264 (quoting *Florasynth v. Pickholz,* 750 F.2d 171, 173–74 (2d Cir.1984)). Therefore, the burden on a claimant for vacation of an arbitration award due to "evident partiality" is heavy, and the claimant must establish specific facts that indicate improper motives on the part of an arbitrator. *Peoples Sec.,* 991 F.2d at 146.

■ In discovery pleadings [2] filed with the AAA during pre-arbitration discovery, IEDC listed several attorneys as counsel-of-record, including Morris Atlas of Atlas & Hall in McAllen, Texas. Neither Morris Atlas, his partner, Charles Murray, nor the firm of Atlas & Hall is mentioned as counsel for IEDC in the responsive pleadings filed for the arbitration by IBC. Close review of the billing statements attached to the attorneys' fees affidavits submitted at the conclusion of the arbitration hearing reveals that Atlas & Hall began work for IEDC in late August 1994, and focused on obtaining a temporary injunction against IBC, fighting the motion to compel arbitration, seeking a mandamus from the court of appeals, and pursuing a mediated settlement. The last billable services were performed on September 28, 1994. Atlas & Hall apparently played no role whatsoever in the arbitration proceedings.

IBC subpoenaed Judge Singleton for a deposition on December 11, 1995, to answer questions about the 1976 grand jury investigation. IBC first learned of the relationship between Morris Atlas and Judge Singleton when Atlas accompanied Singleton to the deposition and stated he was present, not as a lawyer, but as the judge's "close friend." IBC's attorney, Andy Tschoepe, responded "from the International Bank of Commerce's position, we have no problem with you being here." Tschoepe clarified that Atlas was formerly IEDC's counsel in the case and de-

---

**2.** These include notices of oral depositions, requests for production of documents, and interrogatories.

clared that, "I'm not going to raise the fact that he used to be counsel or anything else." Although the record shows that Tschoepe received discovery requests in the early stages of the arbitration which named Morris Atlas as counsel for IEDC, at no point during the deposition of Singleton, filling fifty-one pages of testimony, did Tschoepe take the opportunity to ask Singleton about his relationship with Atlas. It appears from other statements that Tschoepe believed the AAA rules prevented him from asking any questions of Singleton that would reveal bias.

A week later, on December 18, 1995, Morris Atlas was deposed concerning his relationship with Singleton. Atlas and Singleton first met in 1960 and, since then, encountered one another perhaps two or three times a year outside the courtroom at professional conferences, luncheons, and similar functions. Atlas and Singleton did not otherwise socialize or visit one another's homes. Atlas had appeared before Singleton in court a few times but, in court, he declared, everyone is a stranger and no favors are granted or expected. IBC's questioning elicited no facts concerning any further interaction of any kind.

Singleton, a long-time resident of Harris County, contacted Atlas late in 1995 because he needed local counsel for the deposition in Cameron County. When Atlas declined, explaining he had previously acted as local counsel for IEDC, Singleton expressed surprise; he did not know before then that Atlas was acquainted with any party in the arbitration. Atlas claimed he was personally unaware that Singleton was an arbitrator in the proceedings until long after its conclusion. Pressed to explain why he referred to the judge as a "close friend," Atlas explained that he referred to many people whom he had known a long time and saw infrequently as "friends," largely because they liked one another and were always cordial, outside of the courtroom at any rate.

Atlas's use of the phrase "close friend" is not definitive of his relationship with Singleton. The term "friend" is used loosely in the English language and can refer to a person one knows well or one who is more correctly termed an acquaintance. *See* BLACK'S LAW DICT. 667 (6th ed.); WEBSTER'S COLLEGIATE DICT. 467 (10th ed.); *see also* CAMBRIDGE INT'L DICT. OF ENGLISH 565 (1st ed.) (providing numerous illustrations of casual and colloquial use of "friend"). An acquaintanceship springs from occasional interaction so that one knows a person but is not especially familiar with him or her. BLACK'S LAW DICT. 23 (6th ed.); WEBSTER'S COLLEGIATE DICT. 10 (10th ed.). In Texas, it is not unusual to use "friend" and "acquaintance" as rough equivalents. *See, e.g., Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 475 (Tex.1995) (referring to person as both "trusted acquaintance" and "family friend" in same context); *White v. State,* 931 S.W.2d 736, 739 (Tex.App.—Corpus Christi 1996, writ ref'd) (using "friend" and "acquaintance" interchangeably); *Sells v. Texas Employers' Ins. Ass'n,* 794 S.W.2d 793, 796 (Tex.App.—Tyler 1990, writ denied) (characterizing witness as "long-time acquaintance and friend" of appellant). It is clear from Atlas's uncontroverted testimony that his friendship with Singleton was casual rather than intimate and was not regularly maintained.

The seminal "evident partiality" case is *Commonwealth Coatings Corp. v. Continental Cas. Co.,* 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968). In that case, an arbitrator had significant financial dealings over a period of years with a party closely connected to the arbitration. *Commonwealth Coatings,* 393 U.S. at 146, 89 S.Ct. 337. Finding this pecuniary interest to be an indicator of possible bias, the Court vacated the arbitration award. *Id.* at 148–49, 89 S.Ct. 337. In a concurring opinion, Justice White clarified the Court's opinion as mandating disclosure where "the arbitrator has a substantial interest in a firm which has done more than trivial business with a party." *Id.* at 151–52, 89 S.Ct. 337. He noted that "an arbitrator's business relationships may be diverse, indeed, involving more or less remote commercial connections with great numbers of people. He cannot be expected to provide the parties with his complete and unexpurgated business biography." *Id.* at 151, 89 S.Ct. 337 (White, J., concurring).

There are no Fifth Circuit cases addressing the question of evident partiality, *see*

*Burlington Northern Ry. Co. v. Tuco Inc.,* 960 S.W.2d 629, 633–35 (Tex.1997) (reviewing federal courts' interpretation of "evident partiality" standards), but this court has previously addressed the issue of arbitrator partiality in a common law context, finding a relationship must be ongoing and direct rather than speculative and remote. *House Grain,* 659 S.W.2d at 907–08. The legal profession is analogous to business in that its members develop diverse connections with great numbers of people, both within and without the profession, over time. Analogizing from the "substantial interest" language in *Commonwealth Coatings,* a judge or lawyer acting as an arbitrator need not disclose mere recognition of a person or entity connected with the arbitration in the absence of some significant relationship.

Although Singleton and Atlas have met infrequently over the past thirty-plus years and enjoyed a cordial relationship, the record does not reflect any significant relationship between Singleton and Atlas. There is not the slightest pecuniary interest, direct or indirect, flowing to Singleton from his relationship with Atlas. *Cf. Commonwealth Coatings,* 393 U.S. at 148, 89 S.Ct. at 339 (citing *Tumey v. Ohio,* 273 U.S. 510, 524, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927)). Neither is there any personal, social, business, or political interest discernibly affected by the outcome of the arbitration. Atlas expressed not the smallest iota of gratitude for the arbitration panel's award of attorneys' fees to IEDC; in fact, he shrugged off IEDC's outstanding fees as long forgotten. We cannot see that a contrary decision would have affected Atlas and Singleton's nodding familiarity.

Singleton also testified that he and Robert Strauss have been friends for some fifty years. Strauss is a senior partner in Akin, Gump, Strauss, Hauer & Feld, L.L.P., the firm that represented IBC in the arbitration. Singleton made no disclosure of this fact at any point during the arbitration proceedings. Neither party complains of the significance of this relationship.

Rustin Polk, an attorney with the firm of Patton Boggs of Dallas, explained that his firm had called Atlas & Hall and asked that the firm serve as local counsel in proceedings unconnected with the arbitration. There were a few initial meetings and conference calls in which Atlas participated. Afterwards, only Charles Murray had any involvement in the case. Once the arbitration commenced, no one at Atlas & Hall participated in any further proceedings. When he was asked why a copy of the arbitrator candidates list was sent to Atlas & Hall, Polk explained that Atlas & Hall had initially been IEDC's counsel and it is the practice of Patton Boggs to send copies of documents to all counsel-of-record, even though they are no longer actively involved in the case. He did not discuss Singleton's candidacy with anyone at Atlas & Hall, nor did he receive any input from Atlas & Hall.

Atlas acknowledged that some materials connected with the arbitration had been received by his partner, Charles Murray, but because no instructions were received with the copies of interrogatories, etc. submitted by IEDC, no work was done on them. Atlas & Hall's billing statements confirm that even though copies of documents were received by Atlas & Hall, no action was taken. Atlas did not recall being informed by IEDC that the firm's legal fees would be submitted to the arbitration panel. Atlas & Hall had no involvement in the arbitration proceedings after September 1994, when Patton Boggs took over the entire matter.

■ IBC's second major complaint focuses on its claim that Singleton was biased against banks because he had been previously accused of misconduct similar to that alleged against IEDC. IBC contended that IEDC submitted false information concerning its financial health in order to induce IBC to agree to fund the credit facility. Without clarifying the source of its allegations, IBC contends that Singleton was also accused at one time of submitting false financial information to one or more financial institutions to obtain loans, an experience that left him hostile towards banks, and, thus, unqualified to serve as an arbitrator in the instant dispute.

In 1976, Singleton was the subject of a three-month-long investigation by federal authorities and summoned to testify before a

federal grand jury. Although no legal action followed the grand jury hearing, Singleton was called upon to resign his appointment on the federal district court bench. He did not do so and no further action was ever taken against him. Singleton did not mention the investigation at any time during the arbitration proceedings. The precise nature of the grand jury proceedings and allegations against Singleton are unclear.

IBC questioned Singleton about the grand jury investigation held twenty years ago. Singleton recalled that his bank records had been subpoenaed and the allegations concerned loan applications. IBC asked Singleton if the investigation concerned the accuracy of the loan information or the collateral. Singleton responded that the accuracy of his applications may have been questioned, but he could not recall any specific questions or topics of questioning. To the best of Singleton's knowledge, only one other witness, a banker, testified before the grand jury. The substance of the banker's testimony was not known to Singleton.

IBC referred to a University of Pennsylvania Law Review article discussing the use and misuse of judicial investigations as a disciplinary tool. *See* Emily Field van Tassel, *Resignations and Removals: A History of Federal Judicial Service—And Disservice—1789–1992*, 142 U. PA. L. REV. 333 (1993). The article mentions the Justice Department's investigation of Singleton, *id.* at 385–86, and cites two sources for this information, the *Washington Post* newspaper and *Reader's Digest* magazine. *Id.* at 386 n. 239 & 240.[3]

Rustin Polk was counsel for IEDC prior to and throughout the arbitration proceedings. When the AAA submitted the list of arbitrator candidates, Polk used Westlaw to gather additional information on the candidates' backgrounds. After reading some of the opinions written by Judge Singleton, Polk was concerned that Singleton might be in-

clined to prefer IBC. Polk then checked the law review database to see if anything by or about any of the candidates would turn up. This search retrieved the aforementioned law review article. Polk ultimately ranked Singleton ninth out of ten choices because he remained concerned that Singleton might be favorably predisposed towards IBC.

IBC argues that it could not reasonably be expected to search "6,500" databases in order to turn up information about the arbitrator candidates, but admits that it performed no computerized research at all before ranking the candidates. In this case, we believe a reasonable search would have included the appropriate state and federal cases, appropriate regional or topical newspapers, and the law review databases.

After reviewing the entire record, we find that information concerning the grand jury investigation was readily accessible to IBC. The proffered evidence on the grand jury investigation, however, points more strongly to a political "witch hunt" than to any actual wrongdoing and is insufficient evidence to support a finding that disclosure was warranted. Accordingly, we cannot say the relationship between Singleton and Atlas was substantial enough to require disclosure.

We find no evidence in the record that Judge Singleton was evidently partial towards either side. We overrule IBC's first, second, and third points of error.

### 5. MANIFEST DISREGARD OF THE LAW

■ By its fourth point of error, IBC complains that the arbitrators manifestly disregarded the law, thereby exceeding their powers and violating 9 U.S.C. § 10(a)(4). IBC specifically contends the evidence is legally and factually insufficient to support the trial court's findings of fact and conclusions of law that (1) the arbitrators' execution of their powers did not fail to produce a mutual, final, and definite award, (2) the award was

---

3. The law review article is readily accessible in both Westlaw and LEXIS. Although the specific articles used as sources in the law review article are not available through these services, neither of these publications, the *Washington Post* and *Reader's Digest*, is obscure or has ceased publication. Back issues of major U.S. newspapers,

such as the *Washington Post*, are maintained on microfilm or microfiche by many large public and academic libraries. Likewise, back issues of publications such as the *Reader's Digest* are bound and available for research in public libraries.

not arbitrary, capricious, or grossly excessive, and (3) the panel did not manifestly disregard the law in awarding damages.

IEDC does not answer this point, but urges us to overrule it without discussion on the grounds that the FAA does not expressly include or embrace manifest disregard as a grounds for vacatur.

The origin of the doctrine of manifest disregard in federal common law is found in *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953).[4] Arbitrators' interpretations of the law are not subject to review for error, *Wilko,* 346 U.S. at 436–37, 74 S.Ct. 182, unless it is clearly apparent the arbitrators' failure to decide in accordance with the law was not a result of mere misinterpretation. *Id.* at 436, 74 S.Ct. 182. Under such a circumstance, vacatur is permitted. *Id.* Although the Fifth Circuit does not employ a "manifest disregard of the law" standard in reviewing arbitration awards as it is not expressly provided for in the FAA, *R.M. Perez & Assoc., Inc. v. Welch,* 960 F.2d 534, 539 (5th Cir.1992), we are not bound by the decisions of the federal courts of appeals. *Penrod Drilling Corp. v. Williams,* 868 S.W.2d 294, 296 (Tex.1993).

Texas courts apply a concept analogous to manifest disregard. In Texas, an arbitrator may make a "gross mistake" in interpreting and applying the law of such magnitude that an implication of bad faith or failure to exercise an honest judgment is clear. *Nuno v. Pulido,* 946 S.W.2d 448, 452 (Tex.App.—Corpus Christi 1997, no writ). The concept of "gross mistake" has been raised and applied in cases involving both common-law and statutory arbitrations. *See, e.g., J.J. Gregory,* 927 S.W.2d at 33 (Texas general arbitration statute); *Anzilotti v. Gene D. Liggin, Inc.,* 899 S.W.2d 264, 266 (Tex.App.—Houston [14th Dist.] 1995, no writ) (Texas general arbitration statute); *House Grain,* 659 S.W.2d at 905–06 (common-law arbitration).

The federal common-law doctrine of "manifest disregard" has been adopted by most of the federal appellate courts in conjunction with the FAA. *See, e.g., DiRussa v. Dean*

4. Overruled on other grounds, *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)

*Witter Reynolds, Inc.,* 121 F.3d 818, 821 (2d Cir.1997); *Al–Harbi v. Citibank, N.A.,* 85 F.3d 680, 681–682 (D.C.Cir.1996); *Glennon v. Dean Witter Reynolds, Inc.,* 83 F.3d 132, 165–36 (6th Cir.1996); *Prudential–Bache Sec., Inc. v. Tanner,* 72 F.3d 234, 237 (1st Cir.1995). Two federal courts of appeal, the Fifth and Eleventh Circuits, have rejected the manifest disregard of the law standard. *See, e.g., R.M. Perez,* 960 F.2d at 539; *Robbins v. Day,* 954 F.2d 679, 684 (11th Cir. 1992).

The U.S. Supreme Court has not directly addressed the issue of whether the common-law doctrine supplements the FAA or is superseded by it. However, dicta in U.S. Supreme Court opinions suggests that the Court favors the manifest disregard standard in conjunction with the provisions of the FAA. *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 942, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (implicitly recognizing the "unusual circumstance of 'manifest disregard' "); *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 257–59, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (Blackmun, J., concurring and dissenting) (pointing out that inapplicability of FAA limits judicial review to "manifest disregard" standard alone); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 656, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (Stephens, J., dissenting) (coupling manifest disregard of the law with provisions of FAA as ground for judicial review). In light of this, we find the interests of justice are best served by considering the merits of IBC's claims that the arbitrators manifestly disregarded the law.

The arbitrators' award ordered IBC to pay IEDC damages in the amount of $3,246,754 for IEDC's "claims for Breach of Contract" and expressly denied "[a]ny and all other relief sought" by IEDC. The award does not break down the damages award, but IEDC sought recovery of $4,000,000 for lost profits from July 1994 to July 1995 and $1,500,000 for future lost profits, plus $1,090,000 for additional financing costs resulting from IBC's breach of the loan agreement.

(holding predispute agreements to arbitrate under Securities Act of 1933 are enforceable).

IBC points out the following areas in which the panel purportedly disregarded the applicable law for breach of contract: (1) awarding lost profits, (2) awarding damages for breach of an illegal contract, and (3) assessing liability despite the impossibility of performing the contract. We will address each sub-point.

### a. *Lost Profits*

IBC complains that the arbitrators correctly ascertained the law applicable to breach of contract damages, yet completely disregarded it in awarding lost profits to a start-up company without adequate proof.

 The "reasonable certainty" test for lost profits applies in Texas. *Texas Instruments, Inc. v. Teletron Energy Management, Inc.*, 877 S.W.2d 276, 279 (Tex.1994). The party seeking to recover must show that the loss of profits is the natural and probable consequence of the act or omission complained of, and the amount of the loss must be shown by competent evidence with reasonable certainty. *Id.* (citing *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098–1099 (1938)). Although uncertain or speculative evidence is unacceptable, evidence supporting precise calculations is also not necessary; there need only be sufficient data to ascertain profits with a reasonable degree of certainty and exactness. *Texas Instruments*, 877 S.W.2d at 279 (citing *Southwest Battery Corp.*, 115 S.W.2d at 1098–1099). What constitutes reasonably certain evidence of lost profits is a fact intensive determination. *Texas Instruments*, 877 S.W.2d at 279 (citing *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex.1992)); *see also Whiteside v. Trentman*, 141 Tex. 46, 170 S.W.2d 195, 197 (1943) (whether evidence is remote and speculative or sufficient to establish reasonable profit figure is decided on a case-by-case basis). A business venture which is risky in prospect, *i.e.*, one whose activities are dependent on uncertain or changing market conditions, chancy business opportunities, promotion of untested products or entry into unknown or unviable markets, or the success of a new and unproven

enterprise, cannot recover lost profits. *Texas Instruments*, 877 S.W.2d at 279.

 IBC contends that a start-up business is barred from recovering for lost profits because any profits it might have realized cannot be proven with the requisite degree of certainty. However, the fact that a business is new does not, standing alone, serve to bar recovery of lost profits if the entity demonstrates firm reasons, beyond mere realistic hope, to expect a business to yield a profit. *Id.* at 280. At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained. *Szczepanik v. First Southern Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994) (per curiam); *Holt Atherton*, 835 S.W.2d at 84; *Thedford v. Missouri Pac. R.R. Co.*, 929 S.W.2d 39, 47 (Tex.App.—Corpus Christi 1996, writ denied). If a party chooses a particular method of measuring its lost profits, it must provide a complete calculation. *Holt Atherton*, 835 S.W.2d at 85; *Thedford*, 929 S.W.2d at 47. Mere speculation by the plaintiff does not constitute objective information. *Holt Atherton*, 835 S.W.2d at 84; *Thedford*, 929 S.W.2d at 47.

 IEDC built its pipeline and terminal facility in Brownsville as the strategic importance of the location and its proximity to Mexico gave it a unique competitive advantage over other suppliers who likewise courted PEMEX's business. IEDC's competitors incurred much greater transport and delivery costs due to their locations farther from the international bridges over the Rio Grande. PEMEX expressed an interest in dealing with IEDC early on. PEMEX refused to commit to a long-term contract, but did agree to place monthly orders and agreed on a pricing arrangement.

Each month, PEMEX sent in a purchase order for a set number of gallons of LPG. IEDC was to deliver up to ten percent more than specified by PEMEX. The purchase order set the price according to a formula based on the prevailing retail commodity price for gas in south Texas at the time of the order, plus a fixed $0.065[5] per gallon

---

**5.** All prices are set in U.S. funds.

service fee. IEDC expected to purchase the gas required wholesale and resell it to PEMEX at retail.

As evidence of its lost profits, Tom Serleth, vice-president and chief financial officer of IEDC, presented a model of IEDC's lost profits from July 1994 to July 1995, although the lost profits for July and August 1994 were expressly attributed to causes other than IBC's actions. Serleth testified in detail as to how IBC's actions in cutting off IEDC's access to loan proceeds and the letters of credit in August 1994 affected the company in subsequent months.

When IEDC's suppliers presented their letters of credit to IBC and encountered difficulty in getting them paid or had checks returned unpaid by IBC, the suppliers refused to deal with IEDC except on a cash basis. IBC provided no funding after August 1994. During September and October, IEDC attempted to arrange alternative outside financing without success. Some IEDC investors advanced loans to keep the company afloat, but IEDC's sole source of income came from PEMEX's payments on its invoices. Time lags between these cash inflows and payments to and provision of gas by the suppliers meant IEDC was unable to provide any product to PEMEX for days at a time in September 1994. Moreover, the suppliers charged a higher price than they had before, significantly reducing the wholesale/retail price differential IEDC had previously enjoyed.

In October 1994, PEMEX renewed its order for LPG, despite threats to discontinue placing orders, but refused to accept the previously agreed upon pricing formula (then producing a figure of $0.405/gallon), offering instead to pay only $0.37/gallon. Because PEMEX was IEDC's only customer at the time, IEDC had no choice but to accept the lower price. By November 1994, IEDC obtained short-term accounts receivable financing at a high rate of interest but this still did not provide enough cash to enable IEDC to fully meet its obligations to PEMEX.

Although the demand for LPG is highest in Mexico during the winter months, PEMEX decreased its order to 2,000,000 gallons for December 1995; it ordered an additional 1,000,000 gallons later that month and IEDC delivered about half of the additional volume. The damages model reflects that IEDC was unable to completely fill PEMEX's LPG orders until January 1995 despite a steady decrease in the volume ordered. If IEDC had received the funding agreed to by IBC, Serleth opined, it would have been able to obtain the propane and butane required to completely fill PEMEX's orders in a timely manner.

Ultimately, in order to survive, IEDC altered its business strategy from buying and selling LPG to becoming a service facility only: Another company, Texas International, purchased butane and propane, then allowed IEDC to transport the gases to IEDC's terminal facility in Brownsville, mix it into LPG, and deliver it to PEMEX. The profits derived from providing its services to Texas International as a mixing and shipping terminal were substantially lower than if it had provided the product directly to PEMEX. When IEDC bought and sold the gas, the cost/price differential produced a profit averaging between $0.005 and $0.0175 per gallon, plus the fixed $0.065 per gallon service fee (a profit margin of $0.07 to $0.0825 per gallon).

As of June 1995, PEMEX began buying butane and propane directly from Exxon and IEDC handled only the mixing and loading into PEMEX's tanker trucks, thus earning only a service fee of $0.0425 per gallon and entirely losing the wholesale/retail price differential realized when IEDC purchased and sold the LPG. PEMEX's purchase orders declined from a high of 4,500,000 gallons in July 1994 to 2,000,000 gallons in June 1995. Part of the reason for the reduction in the service charge from $0.065 to $0.0425 was because of PEMEX's displeasure with IEDC's history of unreliability. A concession was required to retain PEMEX as a customer.

IEDC presented a summary damages model, which is included in the record, and detailed calculations supporting the figures in the model. These detailed calculations are not in the record, but copies were provided to the arbitrators. The record contains copies

of PEMEX's purchase orders reflecting the initial price formula and fixed $0.065 service charge, the later changes setting the fixed purchase price for LPG to a price below retail, and the reduction of the service charge to $0.0425. Serleth explained the model and the calculations at great length, illustrating the difference between the size of the PEMEX orders received and the amount of LPG actually delivered, the current price per gallon of LPG, the volume of lost sales, and the difference in revenue due to IBC's action. The model also reflects increased costs incurred due to alternative financing, and travel expenses related to pursuing alternative financing.

In August 1995, IEDC and PEMEX signed a one-year service contract. Under this agreement, PEMEX agreed to pay a fixed service fee of $212,500 per month for processing of up to 5,000,000 gallons of gas. For any amount above that, up to 12,000,000 gallons, PEMEX would pay $0.0425 per gallon in additional service charges. IEDC's damages model reflected the difference in revenues and profits the company would have realized if it purchased, processed, and resold the LPG rather than merely performing the processing services. Serleth explained that the future figures had been discounted at a factor of 9.5% to reflect their present value. Serleth stated that he had been conservative in his calculations and projections. The damages model contained forecasts of PEMEX's LPG purchases, numbers that IEDC stated had been provided or suggested by PEMEX before it began placing its monthly purchase orders. On cross-examination, Serleth admitted that there was no contract committing PEMEX to purchase the forecast volumes prior to August 1995.

The testimony of IEDC's accountant, Richard L. Burton, revealed that IEDC's forecasts of sales between June 1994 and July 1995 in its damages model were considerably inflated. Burton claimed the numbers had been provided by a PEMEX representative, Nora Castillo, who lacked purchasing authority. Castillo did not testify at the arbitration hearing. Because Burton was not involved in the preparation of the numbers, he could not explain why the projections of IEDC's

sales to PEMEX were two to three times higher than actual sales to PEMEX for the entire region.

Nonetheless, after the inflated forecast figures are disregarded, we find that IEDC presented sufficient objective historical data from which the arbitrators could determine that IBC's actions rendered IEDC unable to meet PEMEX's demands, decide how much those actions drove IEDC's shift in business strategy, and calculate the impact, past and future, on the company's profits. We find no gross mistake or manifest disregard of the law in the arbitrators' actions.

### b. *Illegality of Contract*

 IBC next complains that its agreement to loan IEDC $9,000,000 was illegal and unenforceable because IBC's legal lending limit under Texas law was only $1,350,000 to a single customer.

IBC cites few cases in support of its argument for illegality. In *Lott v. Farmers' State Bank of Clarendon*, 254 S.W. 1024 (Tex.Civ.App.—Amarillo 1923, no writ), the Amarillo court addressed the subject only in obiter dicta and did not reach a conclusion. *Id.* at 1026.

The remaining cases cited by IBC are not on point. The issue in *Grammer v. City Nat'l Bank of Cleburne*, 262 S.W.2d 106 (Tex.Civ.App.—Waco 1953, writ ref'd n.r.e.), did not address the legality of an agreement to loan an amount in excess of the bank's limits. The Waco court's decision rested on the question of whether the loan officer had authority to extend the loan. *Id.* at 110 (commenting on use of equitable estoppel to prevent denial of validity or binding force and effect of agreement if in fact bank received and retained benefits of agreement). That issue was also addressed in *Streetman v. Benchmark Bank*, 890 S.W.2d 212, 215 (Tex.App.—Eastland 1994, no writ), with a passing comment on the bank's awareness of its legal lending limit before entering into the loan agreement. The matter in IBC's final cited case, *Jaynes v. First Nat'l Bank of Ketchikan, Alaska*, 236 F.2d 258 (9th Cir. 1956), concerned federal law and its applications to a federally-chartered bank.

Only once in our state's jurisprudence has the Texas Supreme Court commented on the question of the validity of a contract where a financial institution exceeds its legal lending limit. In *Goldstein v. Union Nat'l Bank,* 109 Tex. 555, 213 S.W. 584, 588 (1919), the court declared, "the entire matter of overloan [is] one solely between the government and the bank, not affecting the validity of the loan or the ordinary contractual liabilities, or obligations of the parties."

IBC is a state-chartered bank. The Texas banking regulation in effect at the time of the disputed transaction limited the total loans and extensions of credit by a state bank to a single debtor to twenty-five percent of its capital and certified surplus. TEX. CIV. STAT. ANN. art. 342–507(b), *repealed by* Act of June 16, 1995, 74th Leg., R.S., ch. 914, § 26(1), Tex. Sess. Law Serv. 4551, 4551 (Vernon 1995) (current version at TEX. FIN.CODE ANN. § 34.201(a) (Vernon Pamph.1998)). Violation of the statutory lending limit resulted in exposure to criminal penalties. TEX. CIV. STAT. ANN. art. 342–507(e), *repealed by* Act of June 16, 1995, 74th Leg., R.S., ch. 914, § 26(1), Tex. Sess. Law Serv. 4551, 4551 (Vernon 1995) (current version at TEX. FIN. CODE ANN. § 34.202 (Vernon Pamph.1998) (levying civil penalties only)). The penalties were applicable only to the lending institution, not the borrower. *Id.*

After reviewing the supreme court's statement in *Goldstein* in context and noting the few cases referencing TEX. CIV. STAT. ANN. art. 342–507 are concerned solely with the liability of the bank and its officers for excessive loans, *see Seiffert v. State,* 501 S.W.2d 124 (Tex.Crim.App.1973) (criminal liability); *Texas Coastal Bank v. Finance Comm'n of State of Tex.,* 895 S.W.2d 882 (Tex.App.—Austin 1995, no writ) (administrative sanctions), we conclude that an agreement to lend an amount in excess of the financial institution's legal limits is not *per se* illegal and unenforceable between the parties.

 Even if we presumed that the excessive loan agreement was illegal, the illegality of the transaction depended on the existence of facts peculiarly within the knowledge of IBC, which it did not make known to IEDC. IEDC relied on a public statement

of IBC's assets which, unknown to IEDC, was the collective figure for IBC branches statewide, not only IBC—Brownsville. IEDC believed that IBC could readily extend a loan package for $9,000,000. IBC knew that it could not fund a $9,000,000 credit facility, but never informed IEDC that its lending capacity was only $1,350,000. IBC offered no evidence that IEDC had any knowledge of IBC's limitations or intended to violate the law. In fact, it is clear that, had it known IBC could not fund the credit facility, IEDC would have approached other lenders instead. IBC knew full well that it would violate the law if it executed the contract and could not arrange for another lender to cover the excess amount of the loan. Under such circumstances, where one party is unaware of the true facts and believes the contract is lawful, the general rule that an illegal contract is unenforceable does not apply. *See Graham v. Dean,* 144 Tex. 61, 188 S.W.2d 372, 373 (1945) (parties not *in pari delicto* ). Permitting IBC to assert its intentional misconduct as a defense to liability for the injuries suffered by IEDC, in its innocence, would be contrary to public policy. *See id.*

 Furthermore, if a contract can be performed in a legal manner, it is not void merely because it is performed in an illegal manner. *Lewis v. Davis,* 145 Tex. 468, 199 S.W.2d 146, 148–49 (1947). IBC endeavored to make a cooperative agreement with its affiliate, IBC—San Antonio, to fund the portion of the credit facility in excess of $1,350,-00. We can find no statutes forbidding such an arrangement, nor does the testimony of IBC's witnesses suggest the arrangement would be unusual or extraordinary, let alone illegal, within the banking industry. The fact that IBC failed to secure performance of its obligations does not render the contract with IEDC illegal.

c. *Impossibility of Performance*

IBC's complaint that performance of the contract was impossible is predicated on its argument that an illegal contract cannot be enforced. IBC offers no other argument for impossibility of performance. As we have already explained why IBC is not entitled to shield itself by the defense of illegality, the

predicate is insufficient to support a claim of impossibility of performance. Furthermore, we cannot discern from the record that IBC ever urged the arbitrators to declare that performance of the agreement was impossible. IBC cannot raise a new issue outside of the arbitration forum.

We overrule IBC's fourth point of error.

### 6. ARBITRATOR MISCONDUCT DURING PROCEEDINGS

 By its fifth point of error, IBC contends Judge Singleton's conduct during the arbitration proceeding caused a complete breakdown in the integrity of the arbitration process. Specifically, IBC complains that Singleton assumed an advocate's role, forcibly and repeatedly interrupting IBC's presentation of its case, expressing his personal views, advocating a new position, or attacking an IBC witness. IBC argues that Singleton's conduct violated AAA guidelines and, when taken in its entirety, demonstrates that Singleton disregarded unambiguous contract provisions in order to advocate his own personal policy views, thus injecting fundamental unfairness into the arbitration process, and resulting in a completely irrational, arbitrary, or capricious award.

 Misconduct of arbitrators contemplates acts evincing unfairness or contrary to all the principles of a just proceeding. *Mullinax, Wells, Baab and Cloutman, P.C. v. Sage*, 692 S.W.2d 533, 536 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). The record shows that Singleton's manner is undeniably brusque and some of his words are not well-chosen. He argued with IBC's attorney on several occasions and some of his comments on IBC's lack of professional acumen are not readily dismissible (*e.g.* Singleton's declaration that if IBC relied solely on *pro forma* financial statements in making its loan decision, "then that's the dumbest bank I ever dealt with in my life.").

IBC urges us to find Singleton's conduct resulted in material prejudice to IBC's right to a fair hearing. IBC's argument reveals that IBC interprets Singleton's comments and questions through two filters: (1) a presumption that he was biased because of Morris Atlas' connection with IEDC, and (2) the belief that as a result of the grand jury investigation in 1976, Singleton must have a deep-seated bias against financial institutions.

When reviewed in context, without the clouding of the filters IBC urges us to use, it becomes clear that in almost every instance IBC complains of, Singleton was endeavoring either to clarify the evidence, induce IBC to explain the relevance of evidence not clearly connected or directly concerned with the issues in the arbitration, or instruct IBC to present its evidence as well as interpret it, rather than just interpreting unoffered evidence. Despite the singular instances of argument and disrespect, the vast bulk of Singleton's comments and queries throughout the nearly three thousand pages of the arbitration proceedings are concerned with legitimately eliciting and clarifying relevant evidence. IBC has presented no evidence or argument that Singleton's conduct in any way affected his fellow arbitrators, let alone that such influence led to the unanimous award. IBC's fifth point of error is overruled.

### 7. MODIFICATION OF ARBITRATION AWARD

By its sixth point of error, IBC complains the trial court erred by modifying the post-judgment interest rate of the arbitration award and by making an additional award of attorneys' fees.

 The arbitrators' award provides for "post-award interest at an interest rate of 9.75% compounded annually to begin running 10 calendar days from the date this Award is signed by the requisite number of arbitrators." The trial court affirmed the arbitrators' award and the 9.75% rate of interest up to the date of the trial court's judgment with interest to accrue "thereafter at the statutory rate." The statutory rate is greater than 9.75%. *See* TEX. FIN.CODE ANN. § 304.003(c)(2) (Vernon Pamph.1998) (annual interest rate cannot be less than 10%).[6] We

---

**6.** At the time of the trial court's judgment, TEX. CIV. STAT. ANN. art. 5069–1.05 controlled. It has since been repealed. Act of June 19, 1997, 75th Leg., R.S., ch. 1008, § 6, 1997 Tex. Gen. Laws

can find no statutory or case law in support of this modification. *See* 9 U.S.C.A. § 11 (grounds for modifications under federal arbitration act); TEX. CIV. PRAC. & REM.CODE § 171.091 (Vernon Supp.1998) (grounds for modifications under Texas general arbitration statute).

IBC next points out that IEDC submitted its claim for attorneys' fees for both trial and appeal to the arbitrators in the joint pre-trial order and again in its attorneys' fees affidavit. If IEDC is entitled to attorneys' fees, IBC protests, they have already been awarded and the trial court had no authority to change the award.

IEDC responds that because its claims against IBC included an action for breach of contract, the trial court had the discretion, under sections 38.001 and 37.009 of the Texas Civil Practice and Remedies Code, to award additional attorneys' fees. IEDC further contends that although the arbitration agreement provided that the prevailing party was entitled to attorneys' fees arising from the arbitration proceeding, nothing in the agreement precluded an additional award by the trial court. The arbitration agreement, drafted by IBC, states, "The arbitrators, or a majority of them, shall award reasonable attorney's fees and costs to the prevailing party . . . ." IEDC urges us to construe this language against IBC, its drafter, and affirm the trial court's award of additional attorneys' fees.

IEDC submitted its claims for damages, including attorneys' fees on appeal, to the arbitration panel. The arbitrators awarded a lump sum of $568,000 for attorneys' fees on IEDC's breach of contract claims. The arbitrators' award specifically states, "any and all other relief is denied" and "[t]his Award is in full settlement of all claims and counterclaims submitted to this arbitration."

IEDC's reliance on section 38.001 is misplaced. Although section 38.001 permits recovery of attorney's fees for claims on oral and written contracts,[7] IEDC's contract claims were decided in the arbitration and all attorneys' fees the arbitrators found due, both for trial and appeal, were included in the award. *Cf. Kline v. O'Quinn,* 874 S.W.2d 776, 785 (Tex.App.—Houston [14th Dist.] 1994, writ denied) (claims merged into arbitration award precluded recovery of attorneys' fees on appeal).

There is also no basis for recovery of attorneys' fees in a successful defense against an action to vacate an arbitration award. *See Kermacy v. First Unitarian Church of Austin,* 361 S.W.2d 734, 736 (Tex. Civ.App.—Austin 1962, writ ref'd n.r.e.); *see also Babcock,* 863 S.W.2d at 235–36 (party submitted claims for attorney's fees to arbitrator, precluding trial court from interfering with award). Judicial awards of additional relief on matters already decided by the arbitrators is not consistent with the language and policy of the FAA. *See Schlobohm v. Pepperidge Farm, Inc.,* 806 F.2d 578, 581 (5th Cir.1986).

Likewise, we find section 37.009 of the civil practice and remedies code inapplicable. IEDC contends that it is entitled to attorneys' fees because it sought a declaratory judgment from the court. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997). The Uniform Declaratory Judgments Act [8] is merely a procedural device for deciding cases already within a court's jurisdiction. *State v. Morales,* 869 S.W.2d 941, 947 (Tex.1994) (citing *Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993)). A litigant's request for declaratory relief cannot confer jurisdiction on the court, nor can it change the basic character of a suit. *Morales,* 869 S.W.2d at 947.

IEDC's motion for modification "seeks a declaration of each party's rights and obligations with respect to the loan agreement and related documents." This matter was decided by the arbitrators in connection with the breach of contract claim and cannot be relitigated in the trial court. It is clear from IEDC's motion that it is actually seeking

---

7. TEX. CIV. PRAC. & REM.CODE ANN. § 38.001 (Vernon 1997).

8. TEX. CIV. PRAC. & REM.CODE §§ 37.001–.011 (Vernon 1997).

3601, 3602. The current version in the Texas Finance Code is not substantially different. *See* TEX. FIN.CODE ANN. § 304.001 et seq. (Vernon Pamph.1998).

confirmation of the arbitration award. Attorney's fees incurred in the enforcement of an arbitration award cannot be recovered. *Executone Info. Sys., Inc. v. Davis,* 26 F.3d 1314, 1331 (5th Cir.1994); *Amalgamated Meat Cutters v. Great W. Food Co.,* 712 F.2d 122, 125 (5th Cir.1983); *Kline,* 874 S.W.2d at 784–85; *Babcock,* 863 S.W.2d at 236.

We conclude the trial court erred by adjusting the post-judgment interest rate and by awarding additional attorneys' fees. We sustain IBC's sixth point of error.

### 8. DUE PROCESS

By its seventh point of error, IBC contends the arbitration was fundamentally unfair because the arbitrators did not give the parties a full and fair hearing and exercise honest judgment in reaching the award. Although IBC does not argue this point, the basis is apparently IBC's previous contentions of arbitrator partiality, manifest disregard for the law, and other points underlying its preceding complaints. Because we have found those points to be without merit, we overrule the seventh point of error as well.

### 9. TIMELY RENDERING OF ARBITRATION AWARD

■■■ By its eighth point of error, IBC complains the trial court should have vacated the arbitrators' award because it was rendered sixty-nine days [9] after the conclusion of the arbitration proceedings, in violation of rules requiring the award to be made within thirty days, absent the agreement of the parties to reopen the matter and extend the time for the award.

The arbitration proceeding was declared closed on August 2, 1995. The panel informed both parties that it would be at least two weeks before the record could be prepared although the arbitrators intended to begin discussions prior to the record's availability. The arbitrators also noted that there were numerous exhibits and documents supporting the exhibits that none of the arbitrators had reviewed as yet. By implication, the panel warned the parties it might not be able to reach a decision in thirty days.

On August 28, 1995, the panel reopened the arbitration in order to gather additional evidence concerning the amount IEDC owed IBC due to inconsistent and conflicting evidence, both testimonial and documentary, about the applicable interest rate. The panel requested "evidence and/or argument" from IEDC concerning the interest rate and the amount of interest owed by September 11, 1995. IBC was asked to submit any rebuttal by September 18, 1995. IEDC responded on August 30, 1995, with an affidavit from Tom Serleth concerning the amount owed as of August 21, 1995.

IBC responded on September 18, 1995, with several objections to the reopening of the arbitration. IBC protested that, by the panel's own admission, IBC had put on evidence concerning the principal amount owed by IEDC and the interest charged, and that IEDC had made only a nominal effort to controvert this evidence. Thus, IBC contended, the panel erred by reopening the arbitration. Furthermore, IBC claimed, the arbitrators refused to allow the filing of additional briefs by either party following the closing of the hearing. Finally, IBC argued, the panel had no right to reopen the proceeding because "a hearing may be reopened only if the reopening would not prevent the making of the award within the specific time agreed upon by the parties," *i.e.,* thirty days. Because the panel could not make a decision by September 2, 1995, the reopening was invalid. After lodging its objections, IBC parroted the arbitrators' review of the evidence, and made a side-swipe attack on the affidavit offered by Tom Serleth on August 30, 1995.

The arbitration panel rendered its award on September 21, 1995, forty-nine days after the closing of the arbitration hearing.

The AAA rules provide that a hearing is closed upon the declaration of the arbitrators, and require an award to be made within thirty days of the end of the hearing. *See* AMERICAN ARBITRATION ASSOCIATION COMMERCIAL ARBITRATION RULES 35, 41 (1991). A

---

9. The record reflects the arbitrators' award was rendered forty-nine days after the arbitration proceeding was declared closed. We assume IBC means forty-nine days.

hearing cannot be reopened without the parties' consent to an extension of the time for making an award if the arbitration contract contains a specific time limit for making the award; in the absence of a specific contract date, "the arbitrator may reopen the hearing and shall have thirty days from the closing of the reopened hearing within which to make an award." *See id.* at 36.

Because the arbitrators in this case did not make the award until September 21, 1995, nineteen days beyond the thirty-day time limit established by rule 41, IBC contends the award is untimely, violates AAA rules, and must be vacated.

Under common law, where an agreement to arbitrate specified the time for rendition of an arbitration award in a commercial dispute, an award made out-of-time was automatically invalid. *Local Union 560, Int'l Bhd. of Teamsters v. Anchor Motor Freight, Inc.,* 415 F.2d 220, 225 (3d Cir.1969). The FAA does not specifically provide for vacatur on the basis of untimely rendition of an award but it may arguably be included. *See* 9 U.S.C. § 10(a)(4) ("Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."); *see also Svoboda v. Negey Assocs., Inc.,* 655 F.Supp. 1329, 1331–32 (S.D.N.Y.1987).

One federal appellate court has held that if the arbitration contract states unequivocally that the time limits governing the arbitration proceeding, including rendition of the award, are jurisdictional in nature, then an award rendered beyond the due date may be invalidated. *Davis v. Ohio Barge Line, Inc.,* 697 F.2d 549, 555–56 (3d Cir.1983) (arbitrators exceeded powers by rendering late award); *Anchor Motor Freight,* 415 F.2d at 226 (late award automatically invalidated). Another has declared that a time limitation imposed for rendition of an award is directory, not mandatory. *West Rock Lodge No. 2120 v. Geometric Tool Co.,* 406 F.2d 284, 286 (2d Cir.1968). If there is no unequivocal language to the effect that the parties intend the arbitrators to lose jurisdiction if they render a late award, then the arbitrators' authority will not expire for a reasonable period after the date set for the award. *Jones v. St. Louis–San Francisco Ry. Co.,* 728 F.2d 257, 265 (6th Cir.1984); *Anchor Motor Freight,* 415 F.2d at 226.

■ A court has the discretion to uphold a late award when there has been no objection to the delay prior to rendition of the award or no showing of harm or prejudice caused by the delay. *Lodge No. 725, Int'l Assn. of Machinists v. Mooney Aircraft, Inc.,* 410 F.2d 681, 682–83 & n. 4 (5th Cir. 1969) (no jurisdictional language and appellant failed to challenge arbitrators' authority prior to rendition of award); *West Rock Lodge,* 406 F.2d at 286; *McMahon v. RMS Elec., Inc.,* 695 F.Supp. 1557, 1559 (S.D.N.Y. 1988).

We find no language in the arbitration agreement between IBC and IEDC, or in the AAA rules, unequivocally stating that the arbitrators' jurisdiction to render an award expires thirty days after the close of the arbitration proceedings. We will, therefore, consider only the reasonableness of the nineteen-day delay.

A review of the timing of events shows that the delay in the rendition of the award is largely attributable to IBC's actions. The due date of the award was September 2, 1995. Both parties were informed by facsimile transmission on August 28, 1995, that the arbitrators had reopened the hearing. The arbitrators asked IEDC to respond by September 11 and IBC to respond by September 18. The record reflects that IEDC provided the requested evidence on August 30, but IBC did not file its response until September 18. IBC's rebuttal to IEDC's evidence is very brief and most of the response is devoted to objections to the reopening of the hearing. After receiving IBC's response, the arbitrators announced their award three days later. Clearly, the arbitration panel was prepared to hand down its award and was only waiting for IBC to reply. Had IBC submitted its brief response without the three pages of objections attached, the award would probably have been rendered much closer to the intended date of September 2, 1995.

IBC's objections are only tangentially an objection to a delay in rendition of the award. The focus of IBC's complaints is that the arbitrators' wish to obtain more evidence necessary to determine how much money IEDC owed IBC was structured so as to permit IEDC a second bite at the apple. IBC argued that the rules forbid reopening a hearing if reopening would delay the panel's decision. Nevertheless, IBC waited until the last possible day, sixteen days after the target date, to point this out.

Finally, IBC has not shown that it was in any way harmed or prejudiced by the delay. We note that the arbitration panel did not have the record of the hearing for at least two weeks after the closing,[10] had massive piles of exhibits to review,[11] and complex calculations to perform on offsetting claims of damages. Despite this, once IBC submitted its response to IEDC's additional evidence, the panel took only three days to reach its decision. IBC offers no argument that, under the circumstances, the delay was unreasonable. Accordingly, we overrule IBC's eighth point of error.

## 10. ADMISSIBILITY OF ARBITRATION EXHIBITS

■ By its ninth point of error, IBC contends the trial court improperly refused to consider certain arbitration exhibits because they were not authenticated and not the subject of a proper predicate. IBC argues that IEDC stipulated, several times, to include the exhibits in the record.

According to the record of the arbitration hearing, IEDC stipulated that certain exhibits and supporting proof for those exhibits, could be admitted into evidence. IBC contends that these exhibits were forwarded directly to the trial judge by the AAA, and that the trial court refused to consider them.

IEDC refers us to portions of the trial court's hearing on IBC's motion to vacate. IBC attempted to introduce certain documents into evidence before the trial court without adequately demonstrating that they had been offered to the arbitrators as well.

IEDC argued to the trial court that although the referenced portions of the reporter's record from the arbitration hearing reflects a refusal of proffered documents, it does not reflect precisely what the refused documents were as they are neither identified by exhibit numbers nor sufficiently described to enable accurate identification. The trial court sustained IEDC's objection, but also granted IBC permission to reoffer the documents at a later time with appropriate identification, *i.e.*, cites to the arbitration record. IBC never provided the identifying data to the trial court.

In its findings of fact and conclusions of law, the trial court stated: "The documents submitted by the bank and alleged to be exhibits of the arbitration proceeding were not properly authenticated before the court and were not the subject of a proper predicate." IBC interprets this statement as meaning that the trial court refused to review the exhibits from the arbitration provided directly by the AAA. It is not clear to us whether the trial court was referring to the exhibits forwarded to it for *in camera* inspection by the AAA, or the unsupported documents proffered by IBC.

Nonetheless, we have reviewed the questioned exhibits in considering appellant's other points of error and determined that there was no impropriety in the arbitration process warranting vacatur. We conclude that whether the trial court examined the exhibits is moot. Appellant's ninth point of error is overruled.

## 11. CROSS-POINT: REMITTITUR

■ IEDC brings one cross-point complaining of the trial court's order of remittitur in the amount of $350,000. IEDC contends the trial court erred in ordering an equitable remittitur without finding there was factually insufficient evidence to support the arbitration panel's award of damages.

The trial court informed the parties it was familiar with the facts of the case and made

---

10. The reporter's record from the arbitration hearing contains some 2,600 pages and fills eleven thick volumes.

11. Altogether, some five hundred exhibits and supporting documents were presented to the arbitration panel.

**58**

no finding that the evidence was factually insufficient to sustain the arbitrators' award. To the contrary, the court made it clear to the parties that any remittitur would be grounded in equity. After hearing both sides argue the motion for new hearing, the trial court recessed for twenty minutes while the judge deliberated. When proceedings resumed, the judge announced his intention to grant IBC's motion for new trial, unless IEDC accepted a remittitur of $350,000.

■ Modification of an arbitration panel's award is permitted only if (1) there is an evident material mistake or miscalculation, or (2) the award is based on a matter not submitted to them, or (3) the award is imperfect in a matter of form not affecting the merits of the controversy. 9 U.S.C.A. § 11. An equitable remittitur does not meet any of these grounds. Equity is justice according to fairness. BLACK'S LAW DICT. 546 (6th ed.1990). It is not based on factual mistakes or miscalculations. The court did not find that the arbitrators award was based on an unsubmitted matter, nor that the proceedings were in any way unfair. Remittur is not merely a matter of form, but a material modification of the damages in controversy and decided by the arbitrators. *See ARW Exploration Corp. v. Aguirre,* 45 F.3d 1455, 1463 (10th Cir.1995). We, therefore, sustain IEDC's cross-point.

We modify the trial court's judgment by deleting the change in post-judgment interest and the award of additional attorneys' fees. We also vacate the trial court's order for remittitur. We affirm the arbitrators' award as originally rendered.